Filed 5/7/21  Sherwood v. Vogele CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| ROBERT SHERWOOD et al.,<br><br>     Plaintiffs, Cross-defendants and Appellants,<br><br>     v.<br><br>EUGENE VOGELE et al.,<br><br>     Defendants, Cross-complainants and Respondents. | D076776<br><br><br>(Super. Ct. No. 37-2017-00012535-CU-BC-CTL) |
| ROBERT SHERWOOD et al.,<br><br>     Plaintiffs, Cross-defendants and Appellants,<br><br>     v.<br><br>EUGENE VOGELE,<br><br>     Defendant, Cross-complainant and Respondent,<br><br>CHARLES E. GILBERT et al.,<br><br>     Cross-complainants and Respondents. | D077088<br><br><br>(Super. Ct. No.<br> 37-2017-00012535-CU-BC-CTL) |

CONSOLIDATED APPEALS from a judgment and postjudgment orders of the Superior Court of San Diego County, Kevin A. Enright, Judge. Affirmed.

Lokk Legal, Daryoosh Khashayar and Angela Ness, for Plaintiffs, Cross-defendants and Appellants, Robert Sherwood, Lazy Eye Coffee, LLC, and Ashley Babcock.

Stokes Law, Bonnie Lynn Stokes and Brittany A. Salamin for Defendant, Cross-complainant and Respondent, Eugene Vogele and Linda Luckow, in her capacity as personal representative of the estate of Eugene Vogele.

No appearance for Cross-complainants and Respondents, Charles Gilbert, Kevin Gilbert, and Linde Gilbert.

Plaintiffs and appellants Robert Sherwood and Lazy Eye Coffee, LLC (collectively Sherwood) initiated litigation against defendant and respondent Eugene Vogele arising out of a dispute over building encroachments from Vogele's property on adjacent property leased by Sherwood (the property).[1] The complaint spawned cross-complaints by Vogele against Sherwood and the property's lessor, cross-defendants and respondents Charles Gilbert, Kevin Gilbert, and Linde Gilbert (the Gilberts); by the Gilberts against Sherwood; and by Sherwood against the Gilberts. Trial resulted in a judgment on special verdicts in which a jury, assessing the parties' efforts to mitigate their damages and respective percentages of fault, awarded (1)

---

[1] Ashley Babcock is also an appellant, as she was a cross-defendant in one of the cross-actions. For purposes of appeal, we refer to all three appellants as Sherwood as do appellants in their opening brief. Vogele died in December 2017, and Linda Luckow, his personal representative, took over the matters on behalf of his estate. We will refer to respondent as Vogele even though the party was Vogele's estate.

$6,000 in damages to Sherwood against Vogele and the Gilberts; (2) $50,000 in damages to Vogele against Sherwood; and (3) $620,492 in damages to the Gilberts against Sherwood and Babcock. The trial court later awarded Sherwood $143,183.55 in attorney fees on his operative complaint; and awarded the Gilberts $425,125.94 in attorney fees and costs on their cross-complaint.[2]

Sherwood challenges the jury's special verdict findings as to his mitigation of damages and percentage of fault, the Gilberts' mitigation of their damages, and the award of damages to Vogele, on grounds the findings lack sufficient evidence. He contends the special verdicts resulted from juror bias and prejudice against him, warranting a new trial on that ground as well as on grounds of inadequate damages and inconsistent verdicts. Sherwood finally challenges the attorney fee order, arguing the court abused its discretion by reducing his sought-after fees to an amount the court determined was incurred on his breach of contract claim. We affirm the judgment and postjudgment orders.

---

[2] This court consolidated Sherwood's appeals from the judgment and postjudgment attorney fee orders. Sherwood has sought a partial dismissal of his attorney fee appeal as to the Gilberts, representing those issues are now moot as Sherwood and the Gilberts have settled their respective attorney fee claims. The Gilberts have since filed a "statement of non-interested parties" stating they are no longer parties, will not file briefing, and stipulate to Sherwood's request for partial dismissal. The Gilberts have not filed a respondent's brief, but their nonappearance does not absolve us from adjudicating the merits of Sherwood's appeal from the judgment, in which he challenges the damages awarded to the Gilberts. (See *In re Bryce C.* (1995) 12 Cal.4th 226, 232-233 ["if a respondent fails to file a brief, the judgment [or order] is not automatically reversed"]; *In re Marriage of Everard* (2020) 47 Cal.App.5th 109, 111, fn. 1.) Having consolidated the appeals from the attorney fee order and from the judgment and based on the parties' representations, we simply hold Sherwood's challenge to the attorney fees awarded to the Gilberts is moot, and do not address it on that basis.

FACTUAL AND PROCEDURAL BACKGROUND

We state the facts and view the evidence in the light most favorable to the jury's special verdict, resolving all conflicts and indulging all reasonable inferences to support the judgment. (*American Master Lease LLC v. Idanta Partners, Ltd.* (2014) 225 Cal.App.4th 1451, 1459, fn. 1; accord, *Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 693-694.)

In June 2016, Sherwood leased property from the Gilberts on which Sherwood and Babcock planned to build and operate a coffee house. The lease payment for the first year was $6,160 per month. The Gilberts' property had a "zero lot line," meaning it was "wall to wall" with adjacent property owned by Vogele. The Gilberts eventually understood that Sherwood's project contemplated a second story rooftop deck, but the lease specified that they did not make representations about the property and Sherwood accepted the property "as is." The lease also contained a hold harmless clause by which Sherwood would represent and indemnify the Gilberts if he caused a claim to be filed against them.

The project was the first time Sherwood had ever built a business from the "ground up." Sherwood hired a general contractor and a designer, neither of whom had ever done a ground up commercial project. The designer did not have an architectural license, nor was she working under an architect. She did not have a survey done in the initial pre-design phase. After Sherwood entered into the lease, his contractor noticed that shed roof eaves from Vogele's property were overhanging onto the Gilberts' property and would impede the ability to build the project. The Gilberts did not notice the eaves were overhanging or perceive them an encroachment onto their property until it was brought to their attention. Kevin Gilbert first sought to resolve the matter informally and amicably with Vogele, but intended to follow up

4

with a City of San Diego (City) code enforcement complaint if unsuccessful. Sherwood, on the other hand, expressed he saw "no alternative but to turn this over to [his] attorneys." In late August 2016, he e-mailed Kevin Gilbert that it was his opinion that Vogele had "zero intention" to resolve the matter and "make this right." Kevin Gilbert felt that from "day one" Sherwood did not believe Vogele would take down the encroachments.

After Sherwood's attorney demanded Vogele remove the encroaching eaves, Vogele and Sherwood in September 2016 entered into a written agreement by which Vogele would "remov[e] all existing illegal roof overhangs" and also remove a separate small three-window structure, which City had determined was a permit violation. On October 12, 2016, the day Vogele was to begin his work to remove the encroachment, Sherwood sent an e-mail copying Kevin Gilbert and others telling them that if he did not see Vogele's removal work in progress, he would commence litigation "without further delay." Sherwood stated he did not want to give Vogele "so much as a one-hour extension." Sherwood wrote: "We will have to proceed as if the work [by Vogele] will not be done, which means we will have to spend considerably more on the build-out to accommodate the problem." He continued: "For this reason I want to seek a million dollars in damages, and if in the end it is less, the amount can be adjusted down." Sherwood told Kevin Gilbert to break off negotiations with Vogele and Gilbert did so. Gilbert understood that this meant Sherwood was going to spend more money and build the project, but proceed with litigation against Vogele for damages.

In early 2017, based on communications from Sherwood and his designer, the Gilberts believed Sherwood was designing a "workaround" to the encroaching eaves, with a complete tear down of the existing building and

5

construction of a new building. Based on that understanding and believing Sherwood was going to proceed with the project, the Gilberts authorized the demolition. In fact, Sherwood's contractor was not asked to come up with alternative solutions regarding the encroaching eaves, and the final City-approved permit for the coffee shop showed the zero lot line without any mention of the encroaching eaves. Sherwood's designer never found a definitive solution to design around the eaves. In February 2017, she e-mailed Sherwood about potential workarounds, but Sherwood wanted to proceed with the demolition permit, stating, "Once we begin demo[lition], it kind of paints a picture of Vogele that is a point of no return." Sherwood's attorney directed the designer to not submit redesigns to City for approval because Sherwood and his lawyer wanted a better understanding of which way the litigation was moving. Had the Gilberts known Sherwood was not proceeding with a workaround for his project, they would not have given permission to demolish their building because it would not make financial sense.

In March 2017, Sherwood went ahead and demolished the building on the Gilberts' property. Neighboring businesses complained of property damage as a result of the demolition.

The following month, Sherwood, and eventually Lazy Eye Coffee, LLC, sued Vogele for breach of Vogele's agreement to remove the eaves, fraud (intentional misrepresentation), willful and negligent trespass, and nuisance. In that complaint, Sherwood sought a permanent injunction to compel Vogele to remove the encroachment from the property. Vogele filed a cross-complaint against Sherwood and the Gilberts for, among other causes of action, fraud, negligence and trespass. Kevin and Linde Gilbert cross-complained against Sherwood, Babcock and Lazy Eye Coffee, LLC for breach

6

of lease and breach of Sherwood's duty under the lease to indemnify and defend the Gilberts in connection with claims arising from Sherwood's use of the premises. The Gilberts also sought judicial declarations as to Sherwood's duty to defend them and his alleged agreement to accept the premises in an "as is" condition.

Sherwood, however, terminated his lease with the Gilberts in September 2017.[3] He later filed a cross-complaint against the Gilberts alleging causes of action for fraud based on their failure to disclose what he alleged were unpermitted conditions existing on the property including the overhanging eaves, and breach of the covenant of quiet enjoyment. Sherwood sought a judicial declaration that by virtue of the Gilberts' omission of material facts about the property, the lease with the Gilberts was invalid and unenforceable.

Even after Sherwood commenced litigation, Kevin Gilbert believed based on attorney communications that Sherwood's project was only on hold; that Sherwood still intended to build on the property. It was not until the summer of 2018 that Gilbert put out a sign to relet the property. He did not market the property in part because Vogele had placed a lis pendens upon it, which was a cloud on its title. At one point, the Gilberts looked into renting out the empty lot to food trucks, and City advised them depending on the lot size and whether it was paved they could put approximately three such trucks there. Kevin Gilbert found no interested renters, however. And the Gilberts did not have the income to pay for the required paving and fencing,

---

[3]    Sherwood suggests he terminated his lease only because the trial court denied his application for a preliminary injunction. But the jury did not hear this; the record indicates the trial court in an in limine ruling precluded the parties from discussing the fact that Sherwood sought a preliminary injunction or the result of that hearing.

which would have cost between $15,000 and $17,000.  In February 2019, Gilbert hired a broker to sell the property, initially listing it for $1 million but eventually dropping it to $950,000.  The Gilberts' trial expert found the current market value for the property was $700,000.

The matters proceeded to a jury trial, where the parties presented competing experts on damages and Sherwood's due diligence obligations.

Vogele's real estate economist expert Nathan Moeder testified his expertise was in market analysis, as well as financial and development advice to developers and investors on real estate projects.  He explained his services were used to determine whether a project works or not, usually at the front end.  Moeder explained the concept of due diligence.  Understanding the project was a coffee house with a rooftop deck, due diligence would entail hiring architects and structural engineers, getting preliminary cost estimates, and calling City about zoning.  Moeder testified this would be done prior to purchase or lease.  His opinion was that Sherwood did not conduct the proper diligence before signing the lease; Sherwood committed to lease payments and exposed himself financially before knowing he would be able to build the project.  Moeder also opined that Sherwood did not have the right team in place: his design architect was not right for the job, which necessitated structural changes, and Sherwood should have called a time out to find someone who had the proper experience.  Also, Sherwood's structural engineer was brought in too late, after Sherwood had committed himself financially to the project.  According to Moeder, it was a "grave error" to tear down the building on the property because "in real estate development, you're not going to tear down a building, unless you know you can build a new one" and to do so without knowing whether you could build it was "wasting money without knowing that you can do it."  He continued:  "Number two is not only

8

if it's torn down, but if you can't build a new building, now you're stuck with land, and that's one of the damages here of mitigating damages is I don't have a building anymore, and so that's a loss of value." Moeder testified that from a developer or investor's perspective, "I'm not going to keep . . . paying for things, unless I know we can build what we want to build. [¶] And if there is uncertainty with these eaves, what happens in real estate development is you call a time out, you stop everything, you address the eaves problem, and figure that out, and once you have resolution and if they do have to come down or they don't, then you start spending money again in terms of how do we work around it or you haven't wasted money, because you haven't torn down a building and paid for something when you can't build a new one, because the eaves don't have to be taken down. [¶] . . . The proper approach would be to call a time out and address the eaves issue first."

Moeder also explained that due diligence included the type of lease; testifying it was "a whole different ballgame" when the building was removed. According to him, a tenant who builds a new building would want a lease term longer than 15 years to recoup the investment of building a brand new building for the landlord. Moeder testified that in Sherwood's case, a new lease structure should have been considered in the due diligence process with a structural engineer to determine whether the building was not sound and had to be torn down and reconstructed from the ground up.

Vogele's expert in property management and real estate investing, Robert Griswold, testified that even in a lease situation a tenant must conduct due diligence as if it were a purchase, retaining experts to look at everything before signing the lease and making the financial commitment. Such diligence would entail talking to City's development services department, making sure you can get a permit, and hiring engineers and

construction experts. Griswold criticized Sherwood for not doing a financial feasibility study before signing the lease or later, when changing from a remodel to a complete demolition. He explained that in a commercial situation, and particularly where the tenant took the property "as is, where is," the tenant is expected to have done his/her homework and hired the right professionals. Griswold's opinion was that the shed roof and overhang was open and obvious, and did not need to be disclosed by the Gilberts. He also testified the protrusions were not material or significant in that they would not prevent a person from redeveloping the existing building or tearing down and rebuilding. Griswold testified, "[Y]ou could easily build around them, even while you pursue legal action against the property owner." Griswold testified Sherwood's designer did not represent Sherwood well, as there was plenty of time to change course and exit or renegotiate the deal.

The jury returned special verdicts as follows:

On Sherwood's complaint against Vogele and the Gilberts, the jury found in favor of Sherwood that there was a binding contract between Sherwood and Vogele that Vogele breached, and that Vogele negligently trespassed and also maintained a private nuisance, causing Sherwood $1,463,745 in past and future economic damages. However, the jury found Sherwood could have avoided $1,433,745 in damages with reasonable efforts, expenditures or mitigation. It then assigned Sherwood 75 percent of responsibility for his own harm, with Vogele having 20 percent and the Gilberts five percent responsibility.

On Vogele's claims against Sherwood, the jury found Sherwood negligent, but that Sherwood did not negligently puncture Vogele's property so as to cause building materials or debris to enter it. It found Vogele

10

incurred $50,000 in damages to his property, and assigned 100 percent of the responsibility of the harm to Sherwood.

On the Gilberts' claims against Sherwood, the jury found Sherwood breached the contract with the Gilberts; that he failed to perform the requisite due diligence, the Gilberts did not fail to disclose a known defect regarding the property, and the Gilberts were harmed in the amount of $705,308 in past and future economic loss by Sherwood's breach. The jury found that the Gilberts could have avoided $84,816 of those damages with reasonable expenditures or mitigation, leaving them a total of $620,492 in damages. The trial court entered judgment accordingly, ordering that Sherwood take nothing from the Gilberts; Sherwood recover $6,000 from Vogele's estate; Vogele's estate recover $50,000 from Sherwood; the Gilberts recover $620,492 from Sherwood; and Vogele's estate recover $29,027.50 in costs from Sherwood.

Sherwood moved for judgment notwithstanding the verdict (JNOV) and for a new trial, the latter in part on grounds there was jury misconduct as a result of juror bias. Sherwood submitted declarations from two jurors purporting to describe statements from "multiple jurors" about not wanting to give Sherwood "a penny" and stating their own belief the verdicts were based on bias against Sherwood.

The trial court denied the motions, ruling, among other things, the juror declarations were inadmissible as speculative, containing hearsay, and setting forth jurors' mental processes. The court also found sufficient evidence supported the jury's verdicts and Sherwood had not shown any irreconcilable inconsistency in them.

On the parties' competing motions for prevailing party attorney fees, the court awarded Sherwood $143,183.55 in attorney fees. The court reached

11

this amount by taking Sherwood's claim for $572,730.11 in fees, calculating the hours spent using a reasonable hourly rate and reducing those by 75 percent because Sherwood prevailed only on his operative complaint.[4]

Sherwood appeals from the judgment as well as the postjudgment new trial motion order and attorney fee order.

## DISCUSSION

### I. *Sufficiency of the Evidence*

Sherwood challenges the sufficiency of the evidence as to various jury findings, which we discuss seriatim. The applicable standard of review is settled: " ' "When a finding of fact is attacked on the ground that there is not any substantial evidence to sustain it, the power of an appellate court begins and ends with the determination as to whether there is any substantial evidence contradicted or uncontradicted which will support the finding of fact." [Citations.]' [Citation.] 'In a substantial evidence challenge to a judgment, the appellate court will "consider all of the evidence in the light

---

[4]   The court found the reasonable hourly attorney rate was $322.50, the average hourly rate of Sherwood's two attorneys. It found Sherwood did not provide a breakdown of hours spent in litigating his operative complaint's claims, but explained: "The $143,183.55 amount is based on the $322.50 reasonabl[e] hourly rate times 443.98 hours, the amount of hours the court determined was a reasonable amount spent on . . . litigating plaintiffs' contract and tort claims against Mr. Vogele. The 443.98 hours is one-fourth of the 1,775.91 hours, the time the court determined plaintiffs spent in this entire matter ($572,730.11 / $322.50 = 1,775.91). The court, in its discretion, reduced the amount of hours spent in this matter (1,775.91) by 75 [percent] because plaintiffs only prevailed on their operative complaint, which constituted one-fourth of the action in this matter. The other 75 [percent] of this matter consisted of . . . Mr. Vogele's cross-complaint, the Gilberts' cross-complaint, and plaintiffs' cross-complaint against the Gilberts, all in which the plaintiffs did not prevail on. Thus, the court, in its discretion, awards plaintiffs $143,183.55 in attorneys' fees against the Estate." (Some capitalization and emphasis omitted.)

most favorable to the prevailing party, giving it the benefit of every reasonable inference, and resolving conflicts in support of the [findings]. [Citations.]" [Citation.] We may not reweigh the evidence and are bound by the trial court's credibility determinations. [Citations.] Moreover, findings of fact are liberally construed to support the judgment.'" (*In re Marriage of Wozniak* (2020) 59 Cal.App.5th 120, 131.) This standard applies to a jury's special verdicts. (See *Mathews v. Happy Valley Conference Center, Inc.* (2019) 43 Cal.App.5th 236, 251; *Frank v. County of Los Angeles* (2007) 149 Cal.App.4th 805, 816.)

" 'An appellant asserting lack of substantial evidence must fairly state all the evidence, not just the evidence favorable to the appellant. [Citation.] The appellant must "marshall all of the record evidence relevant to the point in question and affirmatively demonstrate its insufficiency to sustain the challenged finding." [Citation.] A failure to state all material evidence may be deemed a waiver of the argument that the evidence was insufficient.'" (*Hartt v. County of Los Angeles* (2011) 197 Cal.App.4th 1391, 1402.)

A. *Sherwood's Mitigation of Damages*

Sherwood concedes that a party suffering damages from a breach of contract has a duty to take reasonable steps to mitigate those damages, and cannot recover for losses that reasonably could have been avoided. However, citing *Seaboard Music Co. v. Germano* (1972) 24 Cal.App.3d 618, he contends that the rule does not apply "where its effect would be to require an innocent party to sacrifice and surrender important and valuable rights." Recounting the underlying facts surrounding his entry into the lease, Vogele's agreement to remove the encroaching eaves, and purported assurances by Kevin Gilbert that Vogele would honor his agreement, Sherwood states he relied on the

13

agreement and assurances in proceeding with the project and demolishing the building. He argues his coffee house was to be a "unique" and " 'signature' " property, and asserts: "At no time prior to the litigation did Vogele communicate his intention not to honor the parties' agreement. Litigation was the last resort in an effort to resolve the problem and to allow the coffee house to be built. The passage of time was occasioned by the continued assurances of [the Gilberts] that they could resolve the eaves problem with Vogele, and Sherwood trusted the Gilberts. All acts undertaken by Sherwood were with the express knowledge and consent of [the Gilberts]. From Sherwood's perspective, it was not until near the filing date of their complaint that they had knowledge that the damage and injury occasioned by Vogele's failure and refusal to honor their contract had accrued. Therefore, it was not until near April of 2017[,] that Sherwood's duty to mitigate damages arose. By this time Sherwood had previously entered into and become obligated to make monthly lease payments; had incurred costs and expenses associated with the project and construction; and had demolished the existing building on the subject property." (Some capitalization omitted.) Sherwood maintains this evidence "was essentially uncontroverted." From it, Sherwood contends no reasonable jury could have concluded that a near 100 percent reduction in a damage award occurred and it committed a "gross miscarriage of justice" as the reduction was without substantial evidence.

"The doctrine of mitigation . . . is a limitation on liability for damages . . . ." (*Clayworth v. Pfizer, Inc.* (2010) 49 Cal.4th 758, 789.) "The doctrine . . . holds that '[a] plaintiff who suffers damage as a result of either a breach of contract or a tort has a duty to take reasonable steps to mitigate those damages and will not be able to recover for any losses which could have been

14

thus avoided.' " (*Valle de Oro Bank v. Gamboa* (1994) 26 Cal.App.4th 1686, 1691.) "The familiar rule requiring a plaintiff in a tort or contract action to mitigate damages embodies notions of fairness and socially responsible behavior which are fundamental to our jurisprudence. Most broadly stated, it precludes the recovery of damages which, through the exercise of due diligence, could have been avoided. Thus, in essence, it is a rule requiring reasonable conduct in commercial affairs." (*Parker v. Twentieth Century-Fox Film Corp.* (1970) 3 Cal.3d 176, 185; *Valle v. Oro Bank*, at p. 1691 [plaintiff who suffers damage from breach of contract or tort "may not recover for damages avoidable through ordinary care and reasonable exertion"].) Typically, " '[t]he rule of [mitigation of damages] comes into play after a legal wrong has occurred, but while some damages may still be averted . . . .' " (*Pool v. City of Oakland* (1986) 42 Cal.3d 1051, 1066, quoting Prosser & Keeton, Torts (5th ed. 1984) § 65, p. 458; see also *Clayworth*, at p. 789.)

The burden of proving a plaintiff failed to mitigate damages is on the defendant. (*Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp., U.S.A.* (2013) 221 Cal.App.4th 867, 884.) Whether the defendant met that burden is a question of fact subject to review for substantial evidence. (*Ibid.*) The adequacy of the plaintiff's actions depends on the circumstances of the case, taking into consideration time, knowledge, opportunity, and expense. (*Brandon & Tibbs v. George Kevorkian Accountancy Corp.* (1990) 226 Cal.App.3d 442, 466.) "The reasonableness of the injured party's efforts must be judged in light of the situation existing at the time and not with the benefit of hindsight." (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1043-1044.)

Sherwood's arguments as to the jury's mitigation finding view the evidence in a light favorable to him, contrary to the principle of substantial

15

evidence review requiring this court to view the evidence favorable to the jury's finding. He does not fully recognize the evidence from which the jury could conclude, for example, that litigation was by no means Sherwood's last resort. The evidence recounted above shows that Sherwood did not seek to limit his losses once he believed in October 2016 that Vogele was not going to act on his September 2016 agreement, but rather as of that time Sherwood intended to sue Vogele for a million dollars in damages and proceed with his project, instructing Kevin Gilbert to cut off communications with Vogele. "One has an obligation to avoid an unwarranted enhancement of damages 'through passive indifference or stubborn insistence upon a conceived legal right . . . .' " (*Valle de Oro Bank v. Gamboa*, *supra*, 26 Cal.App.4th at p. 1691.) Nor does Sherwood acknowledge the expert testimony about the reasonableness of his proceeding with the project and demolition of the existing building when faced with Vogele's failure to remove the encroaching eaves. Typically the obligation to mitigate damages begins once a legal wrong has occurred (*Valle de Oro Bank*, at p. 1691), and here the evidence was that Sherwood went ahead with the project and demolition, even obtaining permits for his original plans, though by October 2016 he believed Vogele was not going to abide by their agreement and take steps to remove the encroaching eaves. The jury reasonably reached its mitigation finding in view of this evidence. Sherwood cites no authority convincing us that the fact the Gilberts knew about Sherwood's actions—or agreed to the demolition believing Sherwood and his team would build around the problem—relieves Sherwood from the obligation to mitigate his own losses.

Sherwood asserts the evidence shows in January and February 2017 the Gilberts continued to assure him Vogele would honor his agreement to remove the eaves, and on that basis he proceeded with demolition. He

16

asserts that after the Gilberts' assurances proved false, "it was agreed" Sherwood would commence litigation. Even if there were some relevance to the jury's mitigation finding that Sherwood moved forward only because of Kevin Gilbert's assurances, such circumstances are contradicted by other evidence that we credit in our substantial evidence review. When asked if in January 2017 he continued to reassure Sherwood that Vogele would remove the eaves, Kevin Gilbert denied he told Sherwood not to worry; he testified that he agreed to continue to talk to Vogele to nudge him in the right direction as long as Sherwood wanted Gilbert to do so. Gilbert testified that despite this, in January 2017 Sherwood continued to say he did not believe Vogele would remove the eaves, which according to Gilbert was what Sherwood said from "day one." Kevin Gilbert denied agreeing to or approving Sherwood's lawsuit; he testified that in making complaints with City he intended not to be part of any litigation against Vogele and always advised Sherwood to let City put pressure on Vogele and exhaust administrative remedies rather than resort to the courts.

Nothing about Sherwood's cited authority, *Seaboard Music Co. v. Germano*, *supra*, 24 Cal.App.3d 618 convinces us to overturn the jury's mitigation finding or hold Sherwood was not required to mitigate his damages. In *Seaboard Music*, the court decided whether a plaintiff, the lessor of a jukebox and pool table, should have been required to mitigate damages by re-leasing the equipment it got back from a defendant after the defendant repudiated his lease contract for those items. (*Seaboard Music*, at p. 622.) The Court of Appeal declined to apply the mitigation rule: "We are not concerned here with the owner of a single house or a single piece of equipment who enters into a lease. Such an owner can recoup or reduce the loss he sustains from a breach by re-leasing the property. The evidence here

17

shows plaintiff was engaged in the business of leasing coin-operated equipment; it had a warehouse full of equipment similar to that leased to [the defendant] from which it serviced its customers and from which it could service any additional leases negotiated, irrespective of whether [defendant] fulfilled or breached his obligation. What appellants argue is that plaintiff was obligated to re-lease the equipment repossessed from [defendant] to reduce the liability incurred by reason of the breach in preference to using its own equipment, or additional equipment it might purchase, to carry on its normal business. In effect, they assert plaintiff should mitigate its damages and reduce their liability *by foregoing profit which it would otherwise make in the normal course of its business*. [¶] The rule of mitigation of damages has no application where its effect would be to require the innocent party to sacrifice and surrender important and valuable rights. [Citations.] It may not be imposed to deprive a plaintiff of the benefit of subsequent contracts which would have been available to him irrespective of the original breach." (*Seaboard Music*, at p. 623, italics added.) In *Seaboard*, the court reasoned that a business owner who leases products is not required to sacrifice additional leases available to it so as to re-lease repossessed equipment. It was in that context that the court held mitigation of damages does not apply "where its effect would be to require the innocent party to sacrifice and surrender important and valuable rights." (*Id*. at p. 623.)

The principles expressed in *Seaboard Music Co. v. Germano* have no application here to Sherwood's obligation to avoid continuing expenditures on a specific project that he knew could not go forward without removal of Vogele's encroaching eaves, and then on ensuing litigation. Sherwood is not being asked to forego business available to him *irrespective of Vogele's breach*. (*Seaboard Music Co. v. Germano*, *supra*, 24 Cal.App.3d at p. 623.) Rather,

18

this is a situation where Sherwood elected to not avoid damages " 'through [his] stubborn insistence upon a conceived legal right' " (*Valle de Oro Bank v. Gamboa*, *supra*, 26 Cal.App.4th at p. 1691) to force Vogele to remove the eaves.

In short, Sherwood provides no basis for us to overturn the jury's finding as to his mitigation of damages.

B. *Jury's Allocation of 75 Percent Fault to Sherwood*

Sherwood's challenge to the jury's 75 percent fault allocation to him is cursory.  Asserting "[t]he jury's special verdict found that [he] had a percentage of fault for 75 [percent] for its contract damages," he contends that comparative fault does not apply to a breach of contract cause of action. He then argues:  "Inasmuch as comparative negligence was not a theory that could have or should have been applied to Sherwood's breach of contract cause of action, the jury's determination in this regard was improper and the lower court's incorporation of this finding into its judgment was contrary to law."  (Some capitalization omitted.)

" 'Under the principles of comparative fault, a person's negligent conduct [is] assigned a share of fault greater than zero percent . . . when the conduct was a substantial factor in the causation of the pertinent injuries. [Citations.]' [Citation.]  ' "[L]iability for damage will be borne by those whose negligence caused it in direct proportion to their respective fault." [Citation.]' [Citation.]  'The comparative fault doctrine "is designed to permit the trier of fact to consider all relevant criteria in apportioning liability.  The doctrine 'is a flexible, commonsense concept, under which a jury properly may consider and evaluate the relative responsibility of various parties for an injury (whether their responsibility for the injury rests on negligence, strict liability, or other theories of responsibility), in order to arrive at an "equitable

19

apportionment or allocation of loss." ' [Citation.]" [Citation.]' " (*David v. Hernandez* (2014) 226 Cal.App.4th 578, 591-592, quoting *Pfeifer v. John Crane, Inc.* (2013) 220 Cal.App.4th 1270, 1285, 1287 and *Aidan Ming-Ho Leung v. Verdugo Hills Hosp.* (2012) 55 Cal.4th 291, 303.)

Sherwood's challenge is based on a misreading of the jury's special verdict form, the correctness of which we assess as a matter of law. (*J.P. v. Carlsbad Unified School Dist.* (2014) 232 Cal.App.4th 323, 339; *City of San Diego v. D.R. Horton San Diego Holding Co., Inc.* (2005) 126 Cal.App.4th 668, 678.) Reversible error occurs only where special verdicts are "hopelessly ambiguous." (*Woodcock v. Fontana Scaffolding & Equipment Co.* (1968) 69 Cal.2d 452, 457; accord, *Fuller v. Dept. of Transportion* (2019) 38 Cal.App.5th 1034, 1038.) " ' "A verdict should be interpreted so as to uphold it and give it the effect intended by the jury . . . ." ' [Citation.] Where special verdicts appear inconsistent, if any conclusions could be drawn which would explain the apparent conflict, the jury will be deemed to have drawn them." (*Wysinger v. Automobile Club of Southern Cal.* (2007) 157 Cal.App.4th 413, 424.) However, this court is not permitted to choose between inconsistent answers in a special verdict. (*Singh v. Southland Stone* (2010) 186 Cal.App.4th 338, 358.)

The parties drafted the special verdict form in six sections, five for each of Sherwood's causes of action against Vogele and the Gilberts[5] and the sixth generally labeled "damages (all parties)." (Some capitalization omitted.) As to negligent trespass and private nuisance, the jury found in Sherwood's favor that Vogele recklessly or negligently caused the eaves to enter the

---

[5] Specifically, the special verdict's sections were for Sherwood's claims for breach of contract, negligent trespass, and private nuisance against Vogele as well his claims against the Gilberts for negligent misrepresentation and concealment.

Gilberts' property without Sherwood's permission, and Vogele's conduct was a substantial factor in causing Sherwood harm. The jury found that without Sherwood's consent Vogele created a condition that was harmful to Sherwood's use of the property, the condition interfered with Sherwood's use or enjoyment of the property, an ordinary and reasonable person would have been annoyed or disturbed by the conduct, and the conduct was a substantial factor in causing Sherwood harm. It found the seriousness of the harm from Vogele's conduct outweighed its public benefit, and Sherwood proved the harmful condition was continuing in nature.

The damages section asked the jury to determine Sherwood's damages for "past economic loss including . . . costs involved with the business and project, and rents"; "future economic loss including . . . costs of future rent owed to [the Gilberts]; and past non-economic loss including . . . mental anguish and annoyance." (Some capitalization omitted.) It went on to ask what amount of Sherwood's damages "could have been avoided with reasonable efforts or expenditures, or mitigated?" The jury assessed the verdict forms after considering the arguments of Vogele's counsel, who emphasized Sherwood's lack of diligence in connection with the project's feasibility, and his proceeding with the project even though he believed Vogele was not going to remove the eaves, "push[ing] the plans through permitting as if the eaves don't even exist . . . ."

We see nothing hopelessly ambiguous about the verdict form, which appeared to have joint input from counsel and was finally approved by Sherwood's counsel. Accordingly, we interpret it from its language considered in connection with the pleadings, evidence and instructions, as well as counsel's arguments to the jury. (*Fuller v. Department of Transportation, supra*, 38 Cal.App.5th at p. 1038.)

21

Doing so, we see that the structure of the verdict form did not attribute the comparative fault allocation to Sherwood's breach of contract claim, as Sherwood maintains. The "fair import" of the special verdict (*Fuller v. Department of Transportation, supra*, 38 Cal.App.5th at p. 1038) is that the fault allocation question was directed at the negligence and continuing nuisance claims, to which principles of comparative fault are applicable. (*Tint v. Sanborn* (1989) 211 Cal.App.3d 1225, 1234, ["a trial court properly instructs the jury on comparative negligence principles in a nuisance action alleging damages to real property where . . . a defense claim is made that if a nuisance exists it arose because of . . . negligence"].) It was likewise appropriate for the jury to consider Sherwood's mitigation of damages on the claims sounding in negligence. (*Id.* at p. 1235.) In sum, the special verdict form was not contrary to law as applying comparative fault principles to Sherwood's breach of contract claim, as Sherwood contends.

Further, substantial evidence supports the jury's finding of a 75 percent fault allocation to Sherwood. As summarized above, Vogele's experts Moeder and Griswold testified extensively about Sherwood's failure early on, before signing the lease, to take proper and reasonable steps to ensure the project could actually be built and was financially feasible by hiring the right team of qualified professionals, contacting City, and conducting surveys. Griswold pointed out that particularly where the lease contained an "as is" provision, the burden was on Sherwood to do his homework on the property's suitability for his project. The evidence was that much of Sherwood's damage was caused by his own failure at the project's outset to hire the right team and conduct the proper due diligence before proceeding. The evidence shows that even though Sherwood believed Vogele would never remove the encroaching eaves, he expended money on consultants, obtained a permit,

22

and ultimately demolished the Gilberts' building as if the project could proceed without the encroachments.

C. *Jury's Verdict on The Gilberts' Mitigation of Damages*

Sherwood contends substantial evidence does not support the jury's verdict reducing the Gilberts' damages by only $84,816 for the Gilberts' failure to mitigate their damages. He argues the evidence shows the "utter failure" of the Gilberts in mitigating their damage by failing to lease or advertise the property, pave it and put a surrounding fence for food trucks, and by pricing it for sale well above its fair market value. He states: "If one were to assume that it might have taken the Gilberts three (3) months to pave and fence and property [*sic*] and to secure the food truck tenants, the balance owed on the lease by Sherwood would have been $258,720 (42 months x $6,160 per month)." (Some capitalization omitted.) He submits with that amount as mitigation, the net judgment against him should have been $446,588, not $620,492 as reflected in the jury's verdict.

We cannot say Sherwood has met his burden to show that the Gilberts failed to reasonably mitigate damages in this breach of lease context. (See Civ. Code, § 1951.2, subds. (a)(2)-(3), (c); *Powerhouse Motorsports Group, Inc. v. Yamaha Motor Corp, U.S.A.*, *supra*, 221 Cal.App.4th at p. 884.) The doctrine of mitigation "does not require the injured party to take measures which are *unreasonable or impracticable* or which would involve expenditures disproportionate to the loss sought to be avoided or which may be beyond his [or her] financial means." (*Lu v. Grewal* (2005) 130 Cal.App.4th 841, 850.)

Here, Kevin Gilbert testified the Gilberts did not have the funds to pave their empty lot or place fencing upon it so as to satisfy City demands as a condition to leasing it to food truck vendors, and there were no potential food truck vendors seeking to lease it in any event. Further, even if there

were evidence the Gilberts could have expended capital on the property to conduct some business there, Sherwood is "not entitled to the benefit of [the Gilberts'] hard work and capital in making the property productive; nor should [the Gilberts] be punished for bringing the abandoned property back to life." (*Lu v. Grewal, supra*, 130 Cal.App.4th at p. 851.) In *Lu*, after lessees abandoned a commercial gas station/convenience store lease, the lessors repaired the property and operated the business. (*Id*. at p. 846.) They unsuccessfully attempted to relet or sell the property. (*Ibid*.) The trial court entered judgment for the lessees, finding the lessors had fully mitigated their damages by deriving a profit from the business. (*Id*. at p. 848.) The Court of Appeal reversed on grounds the court applied the wrong mitigation standard and burden of proof, contrary to "notions of fairness, justice and common sense." (*Id*. at pp. 851-852.) The proper measure of mitigation was amount of rental loss the lessees proved could have been reasonably avoided, not the operational profits stemming from lessors' hard work and capital in making the property productive. (*Id*. at pp. 850-851.) The latter is the sort of mitigation standard Sherwood impermissibly seeks to apply here. Sherwood does not otherwise challenge the jury's damages award in the Gilberts' favor. We see no reason to disturb the jury's reduction of $84,816 as the amount of damages the Gilberts could have avoided in mitigation.

D. *$50,000 Award to Vogele*

Sherwood contends there is no substantial evidence to support the jury's $50,000 verdict in Vogele's favor on his trespass cause of action. He points out the jury found he did not recklessly or negligently puncture Vogele's property, and "[s]ince there could be no property damage as there was no trespass, the only logical conclusion to be reached is that the $50,000 award was based on alleged emotional distress suffered by Vogele."

Sherwood argues a plaintiff may not recover emotional distress damages for a negligence-based property damage claim absent proof the defendant's conduct caused physical injury.

Again, this argument is based on a misreading of the jury's special verdict form. The verdict form was drafted in three sections: the first for Vogele's claim of negligence against Sherwood, the second for Vogele's claim of trespass against Sherwood, and the third generally entitled "damages." (Capitalization omitted.) In the first section, the jury found Sherwood was negligent and that his negligence was a substantial factor in causing Vogele harm. In the second section, the jury found Vogele owned his property, but that Sherwood did not recklessly or negligently puncture Vogele's property causing building materials and/or building debris to enter it. With its "no" answer to that latter question, the verdict form nevertheless instructed the jury to proceed to the third damages section, where the jury was asked what amount it awarded Vogele's estate for "past economic damages." It awarded Vogele $50,000 for "damage to the Vogele property." (Some capitalization omitted.)

The structure of the verdict form shows that the jury's damages award pertains to Vogele's claim of negligence, not trespass. And because the verdict form asked the jury to identify the amount of Vogele's "past economic damages," the award is unambiguously *not* an award of noneconomic, emotional distress damages. (See *Burchell v. Faculty Physicians & Surgeons of Loma Linda University School of Medicine* (2020) 54 Cal.App.5th 515, 526 [noneconomic damages include pain and suffering and emotional distress]; *Bigler-Engler v. Breg, Inc.* (2017) 7 Cal.App.5th 276, 300 [describing noneconomic damages as including emotional distress, pain and suffering].)

25

Sherwood does not further challenge the sufficiency of the evidence of the jury's negligence finding or its $50,000 award, but we point out the award is supported by the testimony of Vogele's general contractor expert John Thompson, who testified about the cost to fix Vogele's building caused by the demolition. Among other things, he testified it would cost $50,000 to $75,000 to reconfigure components outside of Vogele's building (access panels for servicing electrical or plumbing, electrical conduit, and rain gutters) if the proposed project were erected next to it.[6] Because Sherwood rendered the Gilberts' property an empty lot and the lots were zero-lot line, the jury could reasonably conclude the reconfiguration of Vogele's property would occur for any new construction. And this conclusion is consistent with Vogele's counsel's closing argument, in which she pointed out in connection with Thomson's $50,000 to $75,000 damages assessment that the lots were zero lot line, and "[w]hatever someone is going to build, whether it's this coffee or shop [*sic*] or anything else, you got to make sure you can still access [components such as electrical or vents]." In sum, Sherwood has provided no basis to disturb the jury's $50,000 damage award to Vogele.

## II. *Alleged Juror Bias and Misconduct*

Sherwood's motion for new trial was based in part on the declarations of jurors L.M. and C.S. Both jurors averred that they disagreed with the jury's verdict as to mitigation, and that the amount of awardable damages stemmed from Sherwood's August 12, 2016 e-mail in which Sherwood stated he had entered into the lease so as to build a rooftop venue, and that he had already spent $30,000 on the project at that point. L.M. averred: "The

---

[6] Thompson also estimated the interior commercial tenant spaces suffered $15,000 in damages from the demolition and it would cost $162,000 to retrofit the now-exposed masonry wall. The jury apparently rejected these elements of damage.

majority of the jury determined that Mr. Sherwood should have stopped the project and terminated the lease as of the date of the August 12, 2016 e[-]mail, and any damages sustained afterward could have been mitigated if he had done so." L.M. continued: "At the start of our deliberations, before we had even examined any evidence, or examined very little evidence, multiple jurors expressed that 'they were not going to give Sherwood a penny' or expressed a similar sentiment. I believe they made this determination before examining all the evidence, as such statements were made before we had a chance to review the evidence and discuss it." L.M. averred: "It is my belief that multiple jurors had a bias against Mr. Sherwood from the beginning and made their vote on the verdict forms based on that bias, not based on the law and evidence." L.M. also averred: "It appeared [the jurors] came with a foregone conclusion and backed their way to the [v]erdict [f]orms. Some of the conclusions did not make sense to me, such as finding Mr. Sherwood should have terminated the contract in August of 2016 but giving the Gilberts over $600,000.00 in damages for Mr. Sherwood failing to pay rent after that date." L.M. also stated the jurors discussed issues not in evidence, such as Sherwood's relationship with Babcock or questioning what his "deal" was with "young girls." L.M. further stated that during deliberations, "more than one juror mentioned a letter not in evidence" disputing the lease termination, though L.M. could not be sure the letter factored into any juror's voting. Juror C.S. made similar averments.

Pointing to the assertions made in these declarations, Sherwood contends the jury's special verdicts were the direct product of bias and prejudice of jurors who said they did not want to "give [him] a penny" before examining any or all of the evidence. He argues that none of the opposing juror declarations dispute that "central thesis . . . ." In his reply brief, he

27

disputes that the declarations delved into the jurors' mental processes. He says the declarations showed jurors "both expressing their actual bias, to wit, they were not going to award [him] 'a dime' and their further conduct implementing that bias, i.e. the [s]pecial [v]erdicts resulting in a negative award to [him]."

" 'The right to unbiased and unprejudiced jurors is an inseparable and inalienable part of the right to trial by jury guaranteed by the Constitution.' " (*Weathers v. Kaiser Foundation Hospitals* (1971) 5 Cal.3d 98, 110; *People v. Galloway* (1927) 202 Cal. 81, 92; *Grobeson v. City of Los Angeles* (2010) 190 Cal.App.4th 778, 810.) Where juror misconduct materially affects the substantial rights of a party, a verdict may be vacated, in whole or in part, on a motion for a new trial. (Code Civ. Proc., § 657, par. Two.) A party moving for a new trial on the ground of juror misconduct bears the burden of establishing misconduct occurred and that misconduct was prejudicial. (*Ovando v. County of Los Angeles* (2008) 159 Cal.App.4th 42, 57; *Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 625.)

To determine whether a party has established juror misconduct, "[t]he trial court must first 'determine whether the affidavits supporting the motion are admissible. [Citation.]' [Citation.] This, like any issue of admissibility, we review for abuse of discretion. [Citation.] [¶] Second, 'If the evidence is admissible, the trial court must determine whether the facts establish misconduct. [Citation.]' [Citation.] . . . [Citation.] On review from a trial court's 'determin[ation of] whether misconduct occurred, "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence. [Citations.]" ' [Citations.] [¶] ' "Lastly, assuming misconduct, the trial court must determine whether the misconduct was prejudicial." ' " (*Barboni v. Tuomi* (2012) 210 Cal.App.4th

28

340, 345.) We independently review whether any misconduct resulted in prejudice. (*People v. Nesler* (1997) 16 Cal.4th 561, 582-583.)

When assessing admissibility of the juror declarations, we abide by Evidence Code section 1150, subdivision (a): "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined." Under this law, we " 'distinguish[ ] "between proof of overt acts, objectively ascertainable, and proof of the subjective reasoning processes of the individual juror, which can neither be corroborated nor disproved . . . ." ' " (*People v. Danks* (2004) 32 Cal.4th 269, 301-302.) It " ' "prevents one juror from upsetting a verdict of the whole jury by impugning his own or his fellow jurors' mental processes or reasons for assent or dissent. The only improper influences that may be proved under [Evidence Code] section 1150 to impeach a verdict, therefore, are those open to sight, hearing, and the other senses and thus subject to corroboration." ' " (*Id*. at p. 302; see *People v. Hutchinson* (1969) 71 Cal.2d 342, 349; *Vomaska v. City of San Diego* (1997) 55 Cal.App.4th 905, 910.)

Here, the trial court did not abuse its discretion by ruling inadmissible the portions of the jurors' declarations stating that it "appeared" to them other jurors "came with a foregone conclusion and backed their way to the Verdict Forms" or it was their "belief" jurors were biased against Sherwood. In addition to the statements being vague and speculative, those remarks seek to relate both the jurors' own mental processes, as well as the mental

29

processes and subjective reasoning of other jurors regarding their deliberations. As such, they cannot be considered under Evidence Code section 1150. (*People v. Danks, supra,* 32 Cal.4th at pp. 300, 302 [statement of juror about reasons for voting for the death penalty were inadmissible statements regarding mental processes and subjective reasoning]; see also *People v. Munoz* (2019) 31 Cal.App.5th 143, 167 [juror declaration about his or her "opinion" about why jurors found a defendant guilty, without additional specific details in support or other evidence, was " 'speculative' and 'unsupported,' " and was insufficient to establish misconduct]; *Lankster v. Alpha Beta Co.* (1993) 15 Cal.App.4th 678, 681, fn. 1 [juror declaration inadmissible to the extent it purported to explain juror's subjective reasoning about why defendant could not be liable]; *Bandana Trading Co., Inc. v. Quality Infusion Care, Inc.* (2008) 164 Cal.App.4th 1440, 1446 [court properly disregarded juror declaration that another juror discouraged others from asking questions and rushed them into completing special verdict form].) The trial court did not abuse its discretion in finding these portions of the affidavits inadmissible.

As for L.M.'s statements that multiple jurors remarked at the outset of deliberations they were not going to give Sherwood a penny, and discussed a letter not in evidence, Vogele presented contrary declarations from other jurors in opposition to Sherwood's motion in which the jurors stated the jury followed the court's instructions and did not make such statements or consider the referenced letter not in evidence. Juror R.P. stated he did not witness or have "any knowledge of any juror stating 'they were not going to give Sherwood a penny.' " Juror M.A. averred she did not "witness any juror making a determination of a verdict by making comments such as 'they were not going to give Sherwood a penny' before we thoroughly discussed and

30

reviewed the evidence, and everyone had the chance for input and discussion of their views." As for the letter, juror R.P. stated, "The letter was mentioned and seconds later it was dismissed because it was not in evidence and we were told not to consider it." That juror continued: "Nor did seeing it briefly have any impact on my or to my observation on the other juror's determinations." Other juror declarations submitted by Vogele were in accord. As stated, in reviewing the order denying a new trial, we defer to the court's credibility determinations on whether misconduct occurred if supported by substantial evidence (*People v. Collins* (2010) 49 Cal.4th 175, 242; *Barboni v. Tuomi*, *supra*, 210 Cal.App.4th at p. 345; *Jie v. Liang Tai Knitwear Co.* (2001) 89 Cal.App.4th 654, 692-693) and indulge all presumptions to support the court's order. (*Jie*, at pp. 666-667.) In view of this evidence, we uphold the trial court's new trial order as to these elements of asserted misconduct by implying a finding that L.M. and C.S. were not credible on them. Such implicit finding is sufficient to support the order. (*Ibid*.)[7]

We reach the same conclusion with regard to L.M. and C.S.'s remarks about jurors' comments regarding Sherwood and "young girls." Importantly,

_____

[7] Notably, the alleged juror statements raised by Sherwood concerning not giving him "a penny" occurred during deliberations, not while evidence was still being presented. This is a significant difference. (See *People v. Allen and Johnson* (2011) 53 Cal.4th 60, 73 [statement by juror that made reference to his previous state of mind at a single point during trial did not indicate an intention to ignore the rest of the proceedings or evidence].) Thus, even if we were to credit these juror statements, as in *People v. Allen and Johnson*, they do not establish the juror "ignored further evidence, argument, instructions or the views of other jurors." (*Ibid*.) "A juror who holds a preliminary view that a party's case is weak does not violate the court's instruction as long as his or her mind remains open to a fair consideration of the evidence, instructions, and shared opinions expressed during deliberations." (*Ibid*.)

Sherwood does not argue these remarks amount to misconduct. And they were contradicted by other juror declarations that showed jurors made detailed examinations of the evidence during deliberations, and discounted the significance of any such remarks. " 'When an issue is tried on affidavits . . . and where there is a substantial conflict in the facts stated, a determination of the controverted facts by the trial court will not be disturbed.' " (*Weathers v. Kaiser Foundation Hospitals*, *supra*, 5 Cal.3d at pp. 108, 109 ["weighing the credibility of conflicting declarations on a motion for new trial is uniquely within the province of the trial court"].)[8] We conclude the court was within it broad discretion in determining the comments did not reflect bias, or rise to the level of misconduct because they are remarks naturally expected in response to the evidence. Further, there is no indication jurors based their verdicts on those remarks. (See, e.g., *English v. Lin* (1994) 26 Cal.App.4th 1358, 1365 [insufficient evidence of juror misconduct where declarations did not show that juror's remarks were

---

[8]   One juror who submitted a declaration in opposition to the motion stated, "Any comments about Mr. Sherwood and 'young girls' did not impact any decision I made regarding the verdicts nor was it something the jury discussed at length. Based upon what I observed and witnessed during deliberations, I do not believe any jurors voted based upon bias or their opinion about Mr. Sherwood, but rather voted based on the evidence presented at trial." Juror R.P. similarly stated: "Any comments on 'young girls' in regard to Sherwood were not a factor in the verdicts—based upon what I witnessed, the jurors considered the testimony and evidence admitted to reach our verdict." Yet another juror stated, "I know I wasn't swayed by a couple comments regarding Mr. Sherwood and I didn't think the other jurors would have been either. We made a thorough timeline of events and we discussed it in great length. We also referred back to it when needed. [¶] I felt that the jury as a whole was very conscientious in going over all the written testimony."

considered as "additional evidence" by other members of the jury, as opposed to an explanation of the particular juror's "reasoning process"].)

### III. *New Trial*

Sherwood contends the trial court should have granted him a new trial on grounds of juror bias and misconduct, as well as inadequate damages based on the jury's mitigation finding and inconsistent verdicts. This contention is largely based on the same arguments we have addressed and rejected above. As to inconsistent verdicts, Sherwood asserts without authority or developed legal analysis that the jury's mitigation finding "is irreconcilable with its concurrent finding holding Sherwood liable for failure to pay past and future rent." He then repeats his arguments that the evidence shows he had no duty to mitigate damages while Kevin Gilbert assured him Vogele would remove the eaves. These bare arguments do not demonstrate there is "no possibility of reconciling [the challenged] findings with each other" so as to disturb them. (*City of San Diego v. D.R. Horton San Diego Holding Co., Inc.*, *supra*, 126 Cal.App.4th at p. 682.) We conclude the trial court did not err by denying Sherwood a new trial.

### IV. *Attorney Fee Award*

Sherwood's challenge to the trial court's attorney fee award is also fairly cursory. He points out an award of fees under Civil Code section 1717 must be based on a contract claim and given to the party prevailing on the contract. He points out the trial court determined he was the prevailing party in his breach of contract claim against Vogele. He correctly observes that the amount of reasonable attorney fees is committed to the trial court's broad discretion and usually begins with the lodestar, which is the number of hours reasonably expended multiplied by the reasonable hourly rate, and then further adjusted based on factors specific to the case to fix the fair

33

market value. (See *Mountain Air Enterprises*, *LLC v. Sundowner Towers*, *LLC* (2017) 3 Cal.5th 744, 751; *PLCM Group v. Drexler* (2000) 22 Cal.4th 1084, 1095-1096; *Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 383.) Those considerations include the nature of the litigation, its difficulty, the amount involved, the skill required and employed in its handling, the attention given, the success or failure and other circumstances. (*PLCM Group*, at p. 1096.) "The trial court's exercise of discretion in deciding whether to increase or decrease the lodestar figure 'will not be disturbed unless the appellate court is convinced the award is clearly wrong.' " (*Espejo*, at p. 383.)

Sherwood then asserts: "It was the breach of contract by Vogele which led to Sherwood's termination of the lease with Gibert. It was that breach which resulted in the filing of suit and the ensuing defense of Vogele's Cross-Complaints against both Sherwood and Gilbert. Thus, but for the breach of contract by Vogele, Sherwood would not have been in the position of defending and incurring substantial attorneys fee expenses in this litigation. Given the totality of the circumstances, Sherwood submits that an arbitrary allocation of but 25 [percent] to the contract claim as the basis for an award of attorneys' fees was an abuse of discretion." (Some capitalization omitted.) This is the entirety of Sherwood's argument against the trial court's $143,183.55 attorney fee award in his favor; he does not challenge the court's determination of a $322.50 reasonable hourly rate or the court's lodestar calculation. Sherwood does not discuss the scope of the attorney fee clause in the contract with Vogele (see *Mountain Air Enterprises, LLC. v. Sundowner Towers, LLC, supra*, 3 Cal.5th at p. 751), nor does he cite authorities pertaining to the allocation or apportionment of attorney fees between tort and contract claims, which was the basis for the trial court's 75 percent

34

reduction (see footnote 4, *ante*). Sherwood does not argue that all of the claims in his action and the cross-complaints were " ' "inextricably intertwined" ' " (*Abdallah v. United Savings Bank* (1996) 43 Cal.App.4th 1101, 1111), had related legal theories (*Pulliam v. HNL Automotive Inc.* (2021) 60 Cal.App.5th 396, 409), or that fees were incurred on factual or legal issues common to both his contract cause of action in which fees were proper and the others in which they were not allowed. (*Cruz v. Fusion Buffet, Inc.* (2020) 57 Cal.App.5th 221, 235; *Erickson v. R.E.M. Concepts, Inc.* (2005) 126 Cal.App.4th 1073, 1083, citing *Abdallah*, at p. 1111; see *Reynolds Metals Co. v. Alperson* (1979) 25 Cal.3d 124, 129-130.)

" 'Apportionment of a fee award between fees incurred on a contract cause of action and those incurred on other causes of action is within the trial court's discretion . . . .' " (*Erickson v. R.E.M. Concepts, Inc., supra*, 126 Cal.App.4th at p. 1083.) Such discretion is abused only when the court's ruling is "clearly wrong" or exceeds the bounds of reason considering all circumstances before it. (*Reynolds v. Ford Motor Company* (2020) 47 Cal.App.5th 1105, 1117; *Santana v. FCS US, LLC* (2020) 56 Cal.App.5th 334, 348-349; see also *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957 ["Judicial discretion 'implies absence of arbitrary determination, capricious disposition or whimsical thinking' " and " 'imports the exercise of discriminating judgment within the bounds of reason' "].) The trial court is in the best position to determine whether allocation of fees is required. (*Cruz v. Fusion Buffet, Inc., supra*, 57 Cal.App.5th at p. 235.) It is Sherwood's burden to show the court abused its discretion. (*Cahill*, at p. 957.)

Sherwood's claim that the court made an "arbitrary" allocation of 25 percent of the attorney fees to his contract cause of action is based only on his

assertion that Vogele's breach triggered his cancellation of the lease, the litigation and his having to defend against the cross-complaints. This assertion does not convince us that the trial court was clearly wrong to allocate one quarter of Sherwood's attorney fees to his successful breach of contract claim—the one of Sherwood's four causes of action on which he was entitled to recover fees. And Sherwood provides no basis for us to conclude his contract cause of action and his tort claims for nuisance, trespass or fraud were so intertwined or had related theories such that the court's decision to award only fees on his contract claim was beyond all bounds of reason.

## DISPOSITION

The judgment and postjudgment orders are affirmed.

O'ROURKE, Acting P. J.

WE CONCUR:

IRION, J.

DATO, J.

36