Filed 8/20/19

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SIX

PETER FULLER etc.,

    Plaintiff and Appellant,

v.

DEPARTMENT OF
TRANSPORTATION,

    Defendant and Respondent.

2d Civil No. B287689
(Super. Ct. No. 14CVP0073)
(San Luis Obispo County)

      A public entity is not liable for an injury caused by a dangerous condition of public property unless the injury was proximately caused by the dangerous condition and the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred. (Gov. Code, § 835[1]; *Cordova v. City of Los Angeles* (2015) 61 Cal.4th 1099, 1105 (*Cordova*).) Here a motorist with a willful and wanton disregard for the safety of others, recklessly tried to pass a tour bus on State Route

---

    [1] All statutory references are to the Government Code unless otherwise stated.

1 near Hearst Castle.  He struck a car driven by appellant, Peter Fuller, head-on.  Appellant was severely injured and his wife was killed.  The jury returned a special verdict that a dangerous condition of public property existed but did not "create a reasonably foreseeable risk that this kind of *incident* would occur."  (Italics added.)  Appellant claims the special verdict is fatally inconsistent warranting a new trial.  We disagree and affirm the judgment in favor of State of California, Department of Transportation (Caltrans).

*Facts and Procedural History*

This head-on collision occurred on State Route 1 near Vista Point 1, about two miles south of Hearst Castle.  The two-lane highway runs north/south, is S-shaped with a slight slope, and has a dashed center line that permits motorists to pass slower vehicles when it is safe to do so.  Jeffrey LaChance drove this portion of highway four times a day, Monday through Friday for 19 years, commuting to work and dropping his wife off at work at Hearst Castle.  On the afternoon of October 10, 2011, LaChance was going northbound and tried to pass a 45-foot tour bus after it crossed Pico Creek Bridge.  Appellant was driving southbound at 55 miles per hour, the posted speed limit.  LaChance failed to pass the tour bus and struck appellant's Toyota head-on, a few feet north of Vista Point 1, a highway scenic turnout.

After the collision, LaChance told CHP Officer Paul Budrow that he could see 3/4 a mile ahead and appellant's Toyota suddenly appeared in front of him.  LaChance pled no contest to misdemeanor reckless driving causing injury and vehicular manslaughter.  (Veh. Code, § 23105, subd. (a); Pen. Code, § 192, subd. (c)(2).)

Appellant sued Caltrans.  His theory was premised upon two dangerous conditions:  (1) the road striping north of Pico Creek Bridge allowed passing despite an alleged dip or blind spot in the road that limited sight distance and obscured visibility, and (2) passing should have been prohibited at the scenic turnout (Vista Point 1) because it was like an intersection and created traffic conflicts when vehicles turned into the scenic turnout.

The evidence showed that there were no dips in the road and the road striping conformed with federal and state highway standards requiring a 900 foot minimum sight distance for safe passing.  Using a road survey and the highway as-built plans, traffic safety expert Kim Nystrom opined that the sight distance, looking north from where LaChance started to pass the bus, was 1,500 feet.  That was consistent with the bus driver's and LaChance's statements that there was a clear line of sight.  LaChance did not say anything about a dip in the road or limited visibility when he spoke to CHP Officer Budrow after the collision.  A third motorist, Elizabeth Rizzo, was following the Fuller car and saw LaChance pull into the southbound lane.  Rizzo said it was "way too late" for LaChance to safely pass the bus.  Rizzo was "[a] hundred percent" sure a collision would occur the moment LaChance pulled into the southbound lane to make the pass.

The jury was provided a special verdict form that was drafted by appellant and asked:  "1. Was the property in a dangerous condition at the time of the *incident*?  [¶]  If your answer to Question No. 1 is 'yes,' then answer Question No. 2."  Question No. 2 asked:  "Did the dangerous condition create a reasonably foreseeable risk that this kind of *incident* would occur?"  (See Judicial Council Cal. Civ. Jury Instructions (2018) 1

CACI,VF-1100, p. 687.)  The jury answered "Yes" to Question No. 1 (10-2) and "No" to Question No.  2 (12-0), finding there was a dangerous condition of public property, but the dangerous condition did not create a reasonably foreseeable risk that this kind of *incident* would occur.[2]  Appellant did not object to the verdict form that he drafted.  Nor did he ask the jury for clarification before the verdict was entered.

*Claimed Inconsistent Jury Verdict*

Appellant contends the special verdict findings are fatally inconsistent and not supported by the evidence.  (See *Oxford v. Foster Wheeler LLC* (2009) 177 Cal.App.4th 700, 716 (*Oxford*) [verdict is inconsistent when it is beyond the possibility of reconciliation under any possible application of evidence and instructions].)  Caltrans asserts that appellant forfeited the inconsistent verdict claim by not objecting or seeking clarification before the verdict was entered.  No objection was required to preserve the issue.  (*Lambert v. General Motors* (1998) 67 Cal.App.4th 1179, 1182; *Zagami*, *supra*, 160 Cal.App.4th at p. 1093, fn. 6.)

On appeal, we review the special verdict de novo. (*Singh v. Southland Stone, U.S.A., Inc.* (2010) 186 Cal.App.4th 338, 358.) "A special verdict is inconsistent if there is no possibility of reconciling its findings with each other.  [Citation.]" (*Id.* at p. 357.)   If the special verdict is not "hopelessly ambiguous," the court may interpret the verdict "'from its language considered in

---

[2] The CACI instruction, VF-1100 uses the word "incident" instead of the word "injury" as specified in § 835.  (See discussion, *post* at pp. 6-7.)  We do not recommend this change as it varies the meaning of § 835.

4

connection with the pleadings, evidence and instructions,'" and counsel's argument to the jury. (*Woodcock v. Fontana Scaffolding & Equip. Co.* (1968) 69 Cal.2d 452, 456-457; see *Oxford*, *supra*, at pp. 718-720 [evidence, instructions and argument]; *Zagami Inc. v. James A. Crone, Inc.* (2008) 160 Cal.App.4th 1083, 1092 (*Zagami*) [pleading, evidence, and instructions].)

The fair import of the special verdict is that the unsafe condition did not create a reasonably foreseeable risk that a driver would attempt to recklessly pass a bus when it was unsafe to do so. The trial court instructed on section 835 which prescribes the conditions on which a public entity may be held liable for injuries caused by a dangerous condition of public property. (*Cordova*, *supra*, 61 Cal.4th at p. 1105.) The jury was instructed that appellant had to prove: "One, that the property was in a dangerous condition at the time of the incident. Two, that the dangerous condition created a reasonably foreseeable risk of the *kind of incident that occurred*. Three, the negligent or wrongful conduct of Caltrans created the dangerous condition. Four, that Peter Fuller was harmed. And five, that the dangerous condition was a substantial factor in causing Peter Fuller's Harm." (Italics added.) It is presumed that the jury followed the instructions and that its verdict reflects the legal limitations those instructions imposed. (*Cassim v. Allstate Ins. Co.* (2004) 33 Cal.4th 780, 803.)

Appellant tried the case on the theory there were two dangerous conditions. The special verdict form, however, did not ask which dangerous condition it was. Was it the road striping north of Pico Creek Bridge which permitted passing even though the line of sight was allegedly restricted due to a dip or blind spot

5

in the road?  Or was it Vista Point 1 which created traffic conflicts for vehicles turning into the rest stop or was it both? Because the special verdict form did not ask the jury to decide the issue with specificity, the jury finding on dangerous condition is tantamount to a general verdict and all reasonable inferences are drawn to support it.  (*Jonkey v. Carignan Construction Co.* (2006) 139 Cal.App.4th 20, 26.)  "If any conclusions could be drawn thereunder which would explain the apparent conflict [in the verdict], the jury will be deemed to have drawn them."  (*Hasson v. Ford Motor Co.* (1977) 19 Cal.3d 530, 540-541 (*Hasson*), overruled on other grounds in *Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574.)  This is a daunting standard of review because the jury found (12-0) there was no reasonably foreseeable risk that this kind of *incident* would occur.  "Where, as here, the judgment is against the party who has the burden of proof, it is almost impossible for him to prevail on appeal by arguing the evidence compels a judgment in his favor."  (*Bookout v. State of California ex rel. Dept. of Transportation* (2010) 186 Cal.App.4th 1478, 1486.)

Appellant argues that "the jury was repeatedly instructed that, in order to find that the property was in a dangerous condition, it must find *inter alia* that the dangerous condition created a reasonably foreseeable risk of the kind of injury which was incurred."  The argument assumes that section 835 foreseeability encompasses any kind of injury or incident once a dangerous highway condition is established.  But that would make foreseeability boundless.  Section 835 requires that appellant prove that "that the injury was proximately caused by the dangerous condition," and "that the dangerous condition created a reasonably foreseeable risk of the kind of injury which

6

was incurred . . . ." Here the jury was instructed to consider a more restrictive foreseeability which required that the dangerous condition "create a reasonably foreseeable risk that this kind of *incident* would occur." (Italics added.) Appellant does not contend that the special verdict form misstates the law, and for good reason. If appellant claimed, for the first time on appeal, that the special verdict form or its questions were defective, the issue would be deemed waived. (See *Zagami, supra,* 160 Cal.App.4th at p. 1093, fn. 6.)

"Before the enactment of the Government Claims Act, the only requirement was that the dangerous or defective condition be a proximate cause of the injury. [Citation.] However, after the enactment of Govt C §835, the plaintiff was also required to establish that the dangerous condition created a reasonably foreseeable risk of the *kind of injury* that was incurred. The fact that the Act included both requirements suggests that the legislature intended to change the former law from requiring only a showing of general foreseeability to requiring a showing that the precise manner in which the injury occurred was reasonably foreseeable." (Van Alstyne et al., Cal. Government Tort Liability Practice (Cont.Ed.Bar 2019) § 12.40, p. 12-61.)

We do not agree that the verdicts are "fatally" or "hopelessly" inconsistent. The jury may have found that the T aspect was the only dangerous condition and it had nothing to do with the collision. Or, it may have found that it was the "sight line" condition but the collision was solely caused by the reckless driver. Or, it may have found that it was both conditions but that the collision was solely caused by the reckless driver. (See *Wysinger v. Automobile Club of Southern California* (2007) 157 Cal.4th 413, 424.)

What appellant is augering for is an appellate holding that once the jury finds an unsafe condition of public property, the public entity is at least 1 percent at fault and a reckless driver cannot be 100 percent at fault. This would do violence to section 835, the special verdict form, and the jury's factual determination. Carried to appellant's logical conclusion, once the jury found a dangerous condition, there was no reason to proceed with other questions and they are superfluous. We are not in agreement with this theory.

*Claimed Dangerous Intersection*

Appellant claimed there were two dangerous conditions and, in closing argument, told the jury "[t]here is a second ground for dangerous condition." "[T]he vista point is an intersection . . . and that intersection had to be striped a hundred feet either side." "Why is the vista point clearly an intersection? . . . People drive in and out . . . . It must be striped. If it's not, that's a dangerous condition."

That is how the case was pled and presented to the jury. The First Amended Complaint alleged that "[t]he presence of a west side turnout (Rest Area) in the middle of this passing zone" was dangerous because "motorists would not have a clear vision of cars that are either entering or exiting the turnout in a constant and unpredictable nature." Appellant's traffic engineer, Edward Ruzak, testified that Vista Point 1 "operates as a conventional, in my idea of conventional, intersection, that should have been striped as double yellow and . . . passing prohibited going through there. . . . [J]ust envision yourself traveling northbound, and someone is in front of you and you wish to pass . . . . And as you start to pull out, the person in front of you makes a left turn right into the vista [point]. Trouble, big

8

trouble." Ruzak opined that motorists traveling northbound "can't see who's coming out of the vista point." "So you've got, basically, T-bones in those situations."

But this was not a "T-bone" collision with a vehicle turning into Vista Point 1. Assuming that the jury believed that Vista Point 1 was a dangerous condition, substantial evidence supported the jury finding that the dangerous condition did not create a reasonably foreseeable risk that this kind of *incident* would occur. Appellant did not object to the special verdict or ask for clarification. He is barred from arguing that there was only one dangerous condition (i.e., that no portion of the 1,500+ foot section of road should have been striped for passing) and that foreseeability was proven as a matter of law.

If the rule were otherwise, a plaintiff could engage in "litigious strategy" and reap a "technical advantage" by redefining what the dangerous condition is on appeal. (*Little v. Amber Hotel Co.* (2011) 202 Cal.App.4th 280, 299-300.) Where the parties try the case on the assumption that certain issues are raised by the pleadings, or that a particular issue is controlling, neither party can change this theory for purposes of review on appeal. (*Sumner Hill Homeowners' Assn.*, *Inc. v. Rio Mesa Holdings*, *LLC* (2012) 205 Cal.App.4th 999, 1026.) "'This doctrine of "theory on which the case was tried," referred to more briefly as "theory of trial," is a well-established rule of appellate practice.' [Citation.]" (*Ibid.*)

*Claimed Blind Spot in the Road*

Appellant claimed the dashed center line north of Pico Creek Bridge was a separate dangerous condition due to a dip or blind spot in the road. Appellant introduced no expert testimony to this effect. His expert said that the passing sight distance was

"woefully short." This claim was refuted. Highway safety expert Kim Nystrom opined that LaChance had a 2,000-foot line of sight after Pico Creek Bridge and that the highway was "completely safe" if a motorist used care in passing a northbound vehicle. LaChance confirmed that he could see "straight down the road" all the way to the vista point.

Appellant contended that the road should have been striped as a no-passing zone for motorists approaching Vista Point 1 because there was a limited line of sight. That was refuted by a three-day road survey, LaChance's statement to the CHP, the CHP accident report, and the bus driver who confirmed there were no road dips or blind spots. LaChance did not see "any dips or anything like that" and had driven the same route 2,000 or 3,000 times. Before that day, he never saw an oncoming vehicle pop out of a blind spot. Elizabeth Rizzo, the motorist following Fuller, confirmed there was no sight distance problem and that she could see LaChance's pickup "perfectly." Accident reconstruction expert Nathan Rose calculated that LaChance was 1,568 feet away from the Fuller vehicle when he changed lanes to pass the bus. LaChance had sufficient time and space to abort the maneuver and drop behind the bus. Instead, LaChance veered onto the road shoulder for the southbound lane, blocking the only escape route for the Fuller vehicle.

Here, the jury found that Vista Point 1 was a dangerous condition of public property (Special Verdict, Question #1), but did not create a reasonably foreseeable risk "that this kind of *incident,*" i.e., a head-on collision with a southbound vehicle passing Vista Point 1, would occur (Special Verdict, Question #2). (Italics added.) In the words of appellant's expert, Vista Point 1 was "[t]rouble, big trouble" and created a foreseeable risk of "T-

10

bone" collisions.  But that is not what happened.  No vehicle turned into or out of Vista Point 1 when LaChance tried to pass the tour bus and veered into the southbound road shoulder, striking the Fuller vehicle head on.  The jury was instructed on Vehicle Code section 21751 as follows:  "'On a two-lane highway, no vehicle shall be driven to the left side of the center of the roadway in overtaking and passing another vehicle proceeding in the same direction unless the left side is clearly visible and free of oncoming traffic for a sufficient distance ahead to permit such overtaking and passing to be completed, completely made, without interfering with the safe operation of any other vehicle approaching from the opposite direction.'"

LaChance's conduct was reckless and just as unforeseeable as a wrong-way driver.  (See, e.g., *Chowdhury v. City of Los Angeles* (1995) 38 Cal.App.4th 1187, 1196 [no foreseeability "that irresponsible drivers will race 100 miles per hour down a highway or drive the wrong way down a one-way street, in violation of the traffic laws"].)  "As one court has observed, any property can be dangerous if used in a sufficiently improper manner.  For this reason, a public entity is only required to provide roads that are safe for reasonably foreseeable careful use.  [Citation.]"  (*Ibid*.)  "'Thus, a public entity should not be liable for injuries resulting from the use of a highway – safe for use at 65 – at 90 miles an hour, even though it may be foreseeable that persons will drive that fast.  The public entity should only be required to provide a highway that is safe for reasonably foreseeable careful use.'"  (*Fuller v. State of California* (1975) 51 Cal.App.3d 926, 940.)  A public entity is not charged with anticipating that a person will use the property in a criminal

way, here, driving with a "willful or wanton disregard for safety of persons or property . . . ."  (Veh. Code, § 23103, subd. (a).)

*Manual on Uniform Traffic Control Devices*

Appellant argues that the trial court erred in ruling that the Caltrans Manual on Uniform Traffic Control Devices (MUTCD) established a legal standard for passing sight distance. Appellant claimed that the Caltrans Highway Design Manual (HDM) required a 1,950-foot passing sight distance for vehicles traveling 55 miles per hour.  Caltrans relied on the MUTCD which provided for a 900-foot minimum sight distance for safe passing.

At a pretrial in limine hearing, the trial court was told that the HDM was used to build new highways and that the MUTCD applied to road striping and traffic controls on existing highways. The trial court found that the MUTCD is "a general standard" and is used by road engineers as "a starting point" in determining a safe passing distance.  Appellant claims that he was not permitted to challenge the MUTCD 900-foot minimum passing distance standard.  That is not correct.  The trial court ruled that appellant's expert could not "be heard to say, '[W]ell, the [MUTCD] should have said something different.'"

Appellant cross-examined Caltrans' expert about whether the MUTCD was actually a legal standard.  Highway safety expert Kim Nystrom stated that the 900 foot sight distance standard is "a starting point" and is not a legal standard or substitute for good engineering, knowledge, experience or judgment.  "It's a minimum," and the line of sight "has to be at least 900 [feet] to allow for safe passing.  You can make it more if you want to or are able to."  Appellant's expert, Ruzak, agreed the

MUTCD 900-foot standard is a starting point, a minimum guideline that is used "all over the United States."

Assuming, arguendo, that the trial court erred in admitting testimony that the MUTCD sight distance standard is the minimum standard for safe passing, the error was harmless because the jury returned a verdict in appellant's favor (10-2) that a dangerous condition of public property existed. (*Post*, p. 13.)  The problem was not sight distance standards but foreseeability.  "There is no liability without [foreseeability or] causation." (*Toste v. CalPortland Construction* (2016) 245 Cal.App.4th 362, 369.)

*Highway Design Manual*

Appellant argues that highway engineer Ruzak was not allowed to rely on the HDM in opining that the safe sight distance for passing was greater than 900 feet.  That misstates the record.  The trial court ruled that Ruzak could say he relied on the HDM in forming his opinion, "but he cannot recite parts of it."

Appellant argues that the trial court erred in ruling that Evidence Code section 721 (barring cross-examination of expert about text materials expert did not rely on) prohibited Ruzak from citing portions of the HDM on direct examination.  The trial court was right for the wrong reason.  Evidence Code section 1200 bars an expert from reciting parts of a hearsay document for the truth of the matter stated.  There is a distinction to be made between allowing an expert to describe the type or source of the matter relied upon as opposed to presenting, as fact, case-specific hearsay that does not otherwise fall under a statutory exception.

The trial court ruled that Ruzak "may not, under the guise of reasons [for expert opinion], bring before the jury incompetent

13

hearsay evidence" but could say that he looked at studies and publications in forming his opinion. Relying on the HDM and other documents, Ruzak opined that a sight distance of 2,000 to 2,300 feet was required for safe passing in a 55 mile per hour zone. Highway safety expert Nystrom disagreed and opined a sight distance of 900 feet or more was safe.

The question of whether the HDM (1,950 feet) or MUTCD (900 feet) minimum sight distance standard applied is not determinative. The jury found that a dangerous condition of public property existed. Appellant, in his opening brief, concedes the conflicting MUTCD and HDM standards have "nothing . . . to do with whether the *type* of injury is foreseeable."

*Impeachment of LaChance Based on No Contest Plea*

Appellant contends that the trial court abused its discretion in admitting impeachment evidence about LaChance's no contest plea to misdemeanor reckless driving and vehicular manslaughter. Penal Code section 1016, subdivision (3) provides that such a "plea may not be used *against the defendant*." (Italics added.) Evidence Code section 1300 limits the admissibility of no contest pleas to crimes punishable as a felony.[3] "The inference is

---

[3] Penal Code section 1016, subdivision (3) states in pertinent part: "The legal effect of such a plea, to a crime punishable as a felony, shall be the same as that of a plea of guilty for all purposes. In cases other than those punishable as felonies, the plea and any admissions required by the court during any inquiry it makes as to the voluntariness of, and factual basis for, the plea may not be used against the defendant as an admission in any civil suit based upon or growing out of the act upon which the criminal prosecution is based."

Evidence Code section 1300 states: "Evidence of a final judgment adjudging a person guilty of a crime punishable as a

14

clear that the exclusion of a nolo contendere plea from the reach of Evidence Code section 1300 was intended to apply only where the plea was offered *against the defendant* in a subsequent civil suit for the same conduct to which the defendant pled." (*Atlas Assurance Co. v. McCombs Corp.* (1983) 146 Cal.App.3d 135, 145.) LaChance, however, was not a defendant within the meaning of Penal Code section 1016. The plea was not offered against LaChance to establish his civil liability.

Appellant argues that the no contest plea was irrelevant because there was no factual basis for the plea. The plea form, which was signed by LaChance and the trial court who took the plea, stated "[t]here is a factual basis of the plea(s)." Here, there was no abuse of discretion in permitting Caltrans to cross-examine LaChance about the plea. LaChance testified that he drove safely, exercised reasonable care, and that his actions did not cause a substantial risk of harm. Pursuant to Evidence Code section 780, a jury may consider "'any matter that has any tendency in reason to prove or disprove the truthfulness of [a witness's] testimony' unless such evidence is inadmissible under some other statutory provision." (*People v. Merriman* (2014) 60 Cal.4th 1, 84.)

Appellant claims that Caltrans "lambasted" LaChance in closing argument by saying that the plea form itself was an admission that LaChance drove recklessly. Defense counsel summarized LaChance's testimony that he was arrested and entered a no contest plea to avoid a felony charge. He also read

---

felony is not made inadmissible by the hearsay rule when offered in a civil action to prove any fact essential to the judgment whether or not the judgment was based on a plea of nolo contendere."

15

from page 4 of the plea form [Exhibit 306] which stated, "'There is a factual basis for the plea,'" and argued "that means that the [criminal] judge found that there was a factual basis for the plea." Appellant objected, "that misstates the law." Overruling the objection, the trial court ruled "that's what [Exhibit 306] says." It did not err. The plea form had already been admitted into evidence, on appellant's motion, during the direct examination of LaChance, at which time the trial court ruled that the "[t]he jury can look" at it. Even if no contest plea form been excluded, the testimony of Elizabeth Rizzo, the bus driver, the CHP officer, LaChance's statements to the officer, and the expert opinion testimony supported the finding that the dangerous condition, whether it be Vista Point 1 or the road striping just after Pico Creek Bridge, did not contribute to LaChance's reckless driving and did not create a reasonably foreseeable risk that this kind of *incident* would occur.

*Trial Court's Examination of Witnesses*

Appellant argues that the trial court "crossed the line by repeatedly asking questions designed to elicit testimony favorable to the defense's principal theory that the accident was LaChance's fault." Appellant forfeited the issue by not objecting. (*People v. Cook* (2006) 39 Cal.4th 566, 598.) On the merits, a trial court may ask questions of witnesses to elicit material facts and clarify testimony to assist the jury in understanding the evidence. (*Ibid.*; *People v. Hawkins* (1995) 10 Cal.4th 920, 948 [same; questions clarifying expert testimony], overruled on other grounds in *People v. Blakely* (2000) 23 Cal.4th 82, 89.) This is not a case where the trial court mocked a witness or became an advocate for either party. (See, e.g., *People v. Sturm* (2006) 37 Cal.4th 1218, 1237-1238.)

16

Elizabeth Rizzo was asked what she saw. The questions were neutral and non-adversarial, as were the questions asked of LaChance's criminal attorney, Ilan Funke-Bilu. Funke-Bilu stated that a criminal judge has to satisfy himself or herself there is a factual basis to enter a no contest plea in a felony case, but not in a misdemeanor case. The trial court asked: "Did you notice on the plea form that the [criminal] judge signed . . . said there is a factual basis for the plea?" Appellant did not object. (Evid. Code, § 353, subd. (a).) We reject the argument that the question was improper or denied appellant a fair trial. The jury was instructed that "pleas of no contest are not deemed conclusive in subsequent civil proceedings as admissions of wrongdoing" and "you must not let bias, sympathy, prejudice or public opinion influence your decision." Appellant claims the jury was "primed to blame LaChance as the passing driver," but there is no evidence that the jury was biased or failed to follow the instructions.

*Lay Witness Opinion Testimony on Causation*

Appellant asserts that the trial court abused its discretion in ruling that CHP Officer Budrow could not offer a lay opinion on causation. Appellant did not try to qualify Officer Budrow as an expert witness. When the in limine motion was argued, appellant conceded that an officer's opinion as to ultimate fault or responsibility for a traffic accident is a legal conclusion and not the proper subject for expert opinion. (See *Carlton v. Department of Motor Vehicles* (1988) 203 Cal.App.3d 1428, 1432.) A lay witness may, however, testify in the form of an opinion if the opinion is rationally based on the perceptions of the witness and helpful to a clear understanding of the witness's testimony.

(Evid. Code, § 800, subds. (a) & (b); *People v. Jones* (2017) 3 Cal.5th 583, 602.)

Appellant was permitted to ask Officer Budrow if a descending slope could cause a northbound driver to have limited sight distance. Officer Budrow agreed that it could lead to an "obscurity" of a motorist's view and that there were no "'Limited Visibility'" or "'No Passing Ahead'" signs posted at Vista Point 1. Appellant argues that Officer Budrow should have been permitted to offer a lay opinion on causation, but that goes beyond the facts of what the officer observed and is inadmissible. (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1308.) The jury returned a 12-0 verdict that "this kind of *incident*" was not reasonably foreseeable.

Appellant's remaining arguments have been considered and merit no further discussion. None of the alleged errors, nor any cumulative effect, warrants reversal.

*Disposition*

The judgment is affirmed. Caltrans is awarded costs on appeal.

<u>CERTIFIED FOR PUBLICATION.</u>


YEGAN, J.

We concur:


GILBERT, P. J.


PERREN, J.


18

Donald G. Umhofer, Judge

Superior Court County of San Luis Obispo

_____

Kerr & Wagstaffe; Wagstaffe, Von Loewenfeldt, Busch & Radwick, James Wagstaffe and Michael Von Loewenfeldt for Plaintiff and Appellant.

Jeanne Scherer, Chief Counsel, G. Michael Harrington, Deputy Chief Counsel, Lucille Y. Baca, Assistant Chief Counsel and Derek S. van Hoften for Defendant and Respondent.