Filed 11/17/21  Warneke v. Bell CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| KIMBERLY WARNEKE et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> JOHN L. BELL, JR., as Trustee, etc., <br><br> Defendant and Appellant. | B303441 <br> (Los Angeles County <br> Super. Ct. No. 16STPB02983) |

APPEAL from an order of the Superior Court of Los Angeles County, Paul T. Suzuki, Judge.  Affirmed.

The Law Offices of John A. Schlaff, John A. Schlaff; Law Office of Barton Mark Senkfor and Burton Mark Senkfor for Defendant and Appellant.

Feinberg, Mindel, Brandt & Klein, Irwin B. Feinberg, Benedon & Serlin, Gerald M. Serlin and Kelly Riordan Horwitz for Plaintiffs and Respondents.

Plaintiffs and respondents Kimberly Warneke and Courtney Raspin brought this action to remove their step-father, defendant and

appellant John L. Bell, Jr., as trustee of the Toni Grant-Bell Trust (TGB Trust), named after plaintiffs' late mother.  During a mandatory settlement conference, the parties entered into a handwritten agreement pursuant to which Bell would step down as trustee, reimburse $65,000 to the trust, and verify the trust account contained $2,068,000 in assets.  Bell and Warneke personally attended the conference and signed the agreement.  Raspin, who had attended the conference telephonically from London, authorized Warneke to sign the agreement on her behalf.  The agreement provided that it was subject to enforcement under Code of Civil Procedure section 664.6, the statutory provision for summary enforcement of a settlement agreement.[1]

Plaintiffs subsequently filed a non-statutory (i.e., not based on § 664.6) verified petition to enforce the agreement.  Bell opposed the petition and argued the agreement was unenforceable, as Raspin had failed to personally sign the agreement, as required by section 664.6.  During an interim hearing, the court inquired of plaintiffs' counsel whether Raspin could file a signed ratification of the agreement.  When counsel answered in the affirmative, the court issued a minute order ordering her signature.

---

[1]     At the time of this action, former section 664.6 provided:  "If parties to pending litigation stipulate, in a writing signed by the parties outside the presence of the court . . . for settlement of the case, or part thereof, the court, upon motion, may enter judgment pursuant to the terms of the settlement.  If requested by the parties, the court may retain jurisdiction over the parties to enforce the settlement until performance in full of the terms of the settlement."

Subsequent unspecified references are to the Code of Civil Procedure.

2

Several days before trial commenced on the issue whether the agreement was enforceable, Bell filed an ex parte application to continue trial, contending that his newly retained counsel had purportedly discovered evidence in Bell's former counsel's file showing that plaintiffs had committed fraud. The court denied the application.

Following a three-day trial, the court entered judgment confirming the agreement in favor of plaintiffs. In doing so, the court reasoned that Raspin's personal signature was not required for the agreement to be enforceable. The agreement merely provided for one means to enforce the agreement through a section 664.6 motion. Because plaintiffs did not proceed by way of section 664.6, the omission of Raspin's signature was irrelevant.

In this appeal, Bell contends the court erred by enforcing the handwritten agreement unsigned by Raspin personally. He also contends the court displayed judicial bias by ordering Raspin's ratification, and abused its discretion by denying his application to continue trial. We reject these arguments and affirm.

## BACKGROUND

A.    *The Toni Grant-Bell Trust* (*TGB Trust*)

In anticipation of their marriage, Bell and plaintiffs' mother, Toni Grant-Bell, entered into a premarital agreement which provided that in the event the couple moved into a residence together, title would be taken in Grant-Bell's name with Bell retaining a life estate. After living out of state for approximately seven years, in 2001 the couple

3

moved to California and purchased a residence (the Alta Loma residence) in which Bell and Grant-Bell held title as joint tenants.[2]

The Toni Grant-Bell Trust (TGB Trust), initially created in 1994, was amended and restated in 2003. The amended trust provided that in the event Grant-Bell predeceased Bell, Grant-Bell's principal residence would be allocated to a separate trust for Bell's use, which would then pass to the trust's beneficiaries upon Bell's death.

Grant-Bell also executed a will in 2003. In her will, Grant-Bell provided that all of her jewelry and personal items shall pass to her surviving children.

By early 2015, Grant-Bell was in declining health and residing in an assisted living facility. Through his counsel (Barbara Taaff), Bell initiated a conservatorship proceeding and was named Grant-Bell's conservator. Consistent with Grant-Bell's estate plan, Bell filed a petition for substituted judgment, and sought authorization to transfer the Alta Loma residence to the TGB Trust and transfer Grant-Bell's jewelry to plaintiffs. On July 13, 2015, the probate court entered judgment approving the requested transfers.[3] Two months later, Bell filed for divorce from Grant-Bell. Grant-Bell passed away on March 27, 2016.

---

[2]    The couple purchased two additional units in the same Alta Loma building in 2002 and 2012, each taking title as joint tenants. Those units are not at issue in this appeal.

[3]    The court also authorized Bell to transfer the two Alta Loma units held jointly by Bell and Grant-Bell to himself individually as his sole and separate property.

B.    *The Underlying Trust Proceedings and Settlement Agreement*

On August 2, 2016, plaintiffs, named beneficiaries in the TGB Trust, filed a petition to remove Bell as successor trustee of the TGB Trust, confirmation of the character of trust property, enforcement of the terms of the trust, an accounting, and surcharge and disgorgement of trustee and attorney fees.  In the petition, plaintiffs alleged Bell had failed to return their mother's jewelry, and sold the Alta Loma residence for $3.5 million, using the proceeds to purchase his own residence.  Bell had covered up the self-dealing by failing to provide plaintiffs an accounting.

Bell filed a first accounting of the TGB Trust on April 17, 2017.  In it, Bell admitted he had commingled proceeds from the sale of the Alta Loma residence with his own assets in a bank account he jointly held with Grant-Bell.  He also admitted that he had disbursed into the same account over $235,000 in insurance proceeds from the loss of Grant-Bell's engagement ring.  Bell alleged he had returned to the trust "the amounts he believed were due the trust" from his commingling of funds.

Plaintiffs filed a petition to recover trust property in September 2017, and alleged inter alia that Bell's real estate transactions dispossessed the TGB Trust of valuable consideration for the Alta Loma residence, and cost the trust approximately $600,000 in unnecessary losses.

The court ordered the parties to attend a March 23, 2018 mandatory settlement conference.  Based on their places of residence (Raspin lived in England; Warneke in Texas), the settlement judge

5

excused each plaintiff from physically attending the conference so long as each were available by telephone.  Nonetheless, Warneke physically attended the settlement conference, and along with her and Raspin's counsel, reached a settlement with Bell and his attorney.

Plaintiffs' counsel memorialized the terms of the settlement in a handwritten document entitled "Settlement Agreement."  The agreement provided in part that Bell would resign as trustee, reimburse the trust $65,000 upon appointment of the successor trustee, provide an updated accounting, and verify a current statement of all trust assets on March 26, 2018.  Another provision stated that the agreement was "subject to" verification that the trust account balance was "~$2,068,00 [*sic*]."  Finally, the agreement stated that it was "subject to CCP § 664.6 and the court shall retain jurisdiction to enforce its terms," and "subject to CCP § 1542 wherein all parties agree to waive any and all claims against the other, known or unknown."  With regard to these provisions, the agreement declared that "Warneke represents that she has the authority to sign on behalf of Courtney Raspin."  Bell, Warneke, and Raspin "by Kim Warneke" signed the document.  Counsel for Bell and plaintiffs also signed the agreement as to form and content.

In a March 28, 2018 minute order, the court noted the parties had reached a settlement, after which Bell requested a continuance to petition for an approval of the agreement, and to amend the accounting. The court ordered both to be done no later than May 15, 2018.

On March 24, 2018 (the day after the parties reached a settlement at the settlement conference), Bell's counsel emailed plaintiffs' counsel

6

two account statements under the TGB Trust verifying a total valuation of $2,068,488.

## C. *The Petition to Confirm the Settlement Agreement*

Plaintiffs did not receive an amended accounting in 2018.[4] On February 4, 2019, they filed a verified petition, supported by signed declarations by Warneke and Raspin, to confirm the handwritten agreement. Plaintiffs sought a judgment enforcing the agreement, which was attached to the petition, and attested to by Warneke and Raspin as being "[s]igned by all parties and counsel" and "fully executed."

In an objection to the verified petition, Bell argued that the agreement could not be enforced in part because Raspin did not personally sign it, as was required under section 664.6. When discussing the objection with counsel the day after it was filed, the court asked if plaintiffs' counsel could have Raspin "just sign it again?" When counsel affirmed that he could obtain the signature, the court stated, "That will ratify her signature that she had authority to sign." The court then bifurcated Bell's accounting from the determination whether the agreement was enforceable, and set the matter for a court trial on July 29, 2019.

On June 19, 2019, Bell filed a written declaration in which he declared, "I hereby revoke my offer to stipulate to settling this case."

---

[4]     The first accounting filed by Bell made in response to the court's order was on May 28, 2019, following another court order to provide an updated accounting.

One day later, Raspin filed a signed declaration in which she "approve[d], ratif[ied], and confirm[ed]" her consent and agreement to be bound by the agreement.

During a three-day trial beginning July 29, 2019, Warneke testified that she participated in the settlement conference and was present when the parties reached an agreement. Raspin testified that while she was not personally present at the settlement conference, she participated through telephonic communication with her sister and their counsel. When the parties reached an agreement, Raspin reviewed a photograph taken of the handwritten agreement, communicated with Warneke about its terms, and directed Warneke to sign the agreement on her behalf.

Bell testified that he too had signed the handwritten agreement. He also admitted that the agreement stated that he was to provide a "statement of assets in the approximate amount of $2,068,000."

At the conclusion of trial, Bell moved for nonsuit based on the omission of Raspin's signature from the agreement. After finding plaintiffs' verified petition to confirm to be a different proceeding than contemplated under section 664.6, the court denied the motion.

The court issued a proposed judgment and tentative statement of decision confirming the handwritten agreement and entering judgment for plaintiffs. Following Bell's objections to the tentative statement of decision, the court adopted its proposed judgment and tentative ruling as final. It reasoned that while Raspin was not required to personally sign the agreement, she had essentially done so by filing ratifications (through the verified petition and declaration) confirming her personal

8

assent to the agreement's terms. Bell's primary argument—that the agreement was unenforceable under section 664.6—ignored the posture of the case, as plaintiffs did not bring the petition to confirm under section 664.6, "and nowhere in that Petition do [plaintiffs] reference said section." The court also noted that Bell had admitted the trust account held approximately $2,068,000 in assets.

## DISCUSSION

A.    *The Settlement Agreement is Enforceable*

Bell asserts the settlement agreement is unenforceable because a "material" term of the agreement, that it "is subject to CCP § 664.6," required Raspin's personal signature, the omission of which negated a "meeting of the minds."

We note that Bell did not argue in the trial court that the section 664.6 provision in the agreement was "material," or that Bell's assent to the agreement was conditioned on plaintiffs personally signing the agreement at the settlement conference. (See *Fuller v. Department of Transportation* (2019) 38 Cal.App.5th 1034, 1041 (*Fuller*) ["Where the parties try the case on the assumption that certain issues are raised by the pleadings, or that a particular issue is controlling, neither party can change this theory for purposes of review on appeal"].) Bell has thus forfeited this argument on appeal.[5]

---

[5]    Bell also appears to have forfeited this argument for failure to address the trial court's principal finding that plaintiffs did not bring their petition to confirm under section 664.6. (See *Denham v. Superior Court* (1970) 2 Cal.3d 557, 564 (*Denham*) [an order of the trial court is presumed correct, and an

9

Even considering Bell's contention on the merits, we find no error. A motion to enforce or confirm a settlement agreement, whether or not brought under section 664.6, requires the trial court to determine "in the first instance whether the parties have entered into an enforceable settlement." (*Osumi v. Sutton* (2007) 151 Cal.App.4th 1355, 1360 (*Osumi*); *Terry v. Conlan* (2005) 131 Cal.App.4th 1445, 1454.) In doing so, the court may consider oral testimony or declarations to determine whether the parties understood and agreed upon material terms of the settlement. (*Osumi, supra*, at p. 1360; see *Cheema v. L.S. Trucking, Inc.* (2019) 39 Cal.App.5th 1142, 1149 (*Cheema*) [failure to reach a "'meeting of the minds on all material points'" in agreement prevents formation thereof].) The court simply decides what terms the parties themselves have agreed upon; the court is without authority to *create* additional terms. (*Osumi, supra*, at p. 1360.)

We review the trial court's factual findings on a motion to enforce or confirm a settlement agreement for substantial evidence, and interpret the terms of the agreement de novo. (*Osumi, supra*, 151 Cal.App.4th at p. 1360; *Karpinski v. Smitty's Bar, Inc.* (2016) 246 Cal.App.4th 456, 461.)

We conclude that under any standard of review, the agreement did not condition its enforceability on the parties' personal signatures. The provision Bell identifies states that the agreement "is subject to CCP § 664.6." This simply affirms the parties' ability to utilize 664.6 as

appellant has the burden of affirmatively showing error]; *In re Sade C.* (1996) 13 Cal.4th 952, 994 [appellant "must raise claims of reversible error or other defect [citation], and 'present argument and authority on each point made'"].)

10

one of several means of enforcing the agreement. (See *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 955 [the words of an agreement are to be construed in their ordinary and popular sense]; *Gauss v. GAF Corp.* (2002) 103 Cal.App.4th 1110, 1122 (*Gauss*) [§ 664.6 is one of several ways in which a party litigant can enforce a settlement agreement]; *Levy v. Superior Court* (1995) 10 Cal.4th 578, 583 [same].) In other words, the Agreement *contemplated* use of section 664.6, but did not itself *impose* the requirements set forth in the statute.

Bell's subjective interpretation requiring the parties' respective signatures is also unsupported by the record. Bell has introduced no evidence (outside of the agreement itself) to suggest that Bell, plaintiffs, or their respective counsel understood that each party was required to personally sign the agreement for it to be enforceable. On the contrary, plaintiffs established they had been personally excused from attending the settlement conference. In fact, Bell signed the agreement with the understanding that Warneke had authority to sign for Raspin. Under the circumstances, and without any conflict in the evidence, we conclude that the parties did not intend to condition the enforceability of the agreement on their personal signatures. (See *Wolf v. Walt Disney Pictures & Television* (2008) 162 Cal.App.4th 1107, 1126–1127.)[6]

---

[6] We also fail to see how this provision constitutes an essential term of the agreement such that its ambiguity renders the entire agreement unenforceable. (See *Cheema, supra,* 39 Cal.App.5th at p. 1149 [terms of an agreement need not be stated "'in the minutest detail,'" but must evidence a meeting of the minds "'upon the essential features of the agreement'"].) The material terms and respective considerations given by each party to the

11

Even if Bell's subjective interpretation were accepted, Raspin did provide a physical signature verifying her assent—she filed a verified petition to confirm the agreement before Bell filed a written revocation. "Nothing in the statutory language suggests that, in a multiparty action, *all* parties must agree to the settlement *in the same manner*. And as long as the parties agree to the *same material terms* . . . the purpose of section 664.6 is satisfied." (*Elyaoudayan v. Hoffman* (2003) 104 Cal.App.4th 1421, 1428.) By filing a signed verification in support of her petition to confirm the agreement and all of its terms, Raspin satisfied the very condition on which Bell contends was required to enforce the agreement. (Compare *id.* at pp. 1424–1425, 1429 [enforcing settlement agreement after several litigants assented on the record while other litigants executed a written agreement outside of court]; *Gallo v. Getz* (1988) 205 Cal.App.3d 329, 333–334 [plaintiff manifested assent to agreement by accepting, endorsing, and depositing into his account a bank draft sent as part of consideration for settlement]; *Gauss, supra,* 103 Cal.App.4th at p. 1121 [plaintiffs presented "no writing signed by [defendant] indicating [its] consent to settle their lawsuits"].)

B.    *Plaintiffs Were Not Required to Reform the Agreement Prior to Filing Their Petition to Confirm*

---

agreement pertain to the distribution and management of trust assets. The parties' memorialization of a statutory right to which they were already entitled can hardly be deemed essential.

Bell contends plaintiffs were required to file a cause of action to reform two ambiguous provisions within the agreement prior to filing their petition to confirm. Those provisions are: (1) "This Agreement is subject to CCP § 1542 wherein all parties agree to waive any and all claims against the other, known or unknown";[7] and (2) "The agreement is subject to verification of the account balance stated as ~$2,068,00 [*sic*]."

Bell never argued in the trial court that plaintiffs were required in the first instance to file a reformation action. His failure to raise this issue in the trial court constitutes a forfeiture on appeal. (*Fuller*, *supra*, 38 Cal.App4th at p. 1041; *In re Marriage of Nassimi* (2016) 3 Cal.App.5th 667, 695.)

The argument is meritless in any event. The trial court did not reform the agreement to create material terms of the settlement; it simply decided what terms the parties themselves had previously agreed upon. (See *Osumi*, *supra*, 151 Cal.App.4th at p. 1360; *In re Marriage of Assemi* (1994) 7 Cal.4th 896, 905 [a motion to enforce a settlement deemed appropriate "even when issues relating to the binding nature or terms of the settlement are in dispute"].) Bell conceded at trial that he was required to, and did in fact, verify the

---

[7] It is undisputed that the parties did not intend to reference *Code of Civil Procedure* section 1542, which sets forth rights and responsibilities with respect to the recovery of escheated property, but instead intended to reference *Civil Code* section 1542. That statute provides: "A general release does not extend to claims that the . . . releasing party does not know or suspect to exist in his or her favor at the time of executing the release and that, if known by him or her, would have materially affected his or her settlement with the . . . released party."

trust held $2,068,000 in assets. Bell also does not dispute that the parties intended to reference section 1542 of the Civil Code, not the Code of Civil Procedure, when discussing waiver of claims. The judgment simply conforms to the parties' intent.

## C. *Judicial Bias*

### 1. *Relevant Background*

During a May 29, 2019 hearing to discuss Bell's objection to plaintiffs' verified petition to enforce, Bell's counsel noted that Raspin had not personally signed the agreement. The following colloquy ensued:

"THE COURT: Let me stop you for a second. [¶] Are we getting the signature of the person that didn't sign it? [¶] . . . [¶]

"THE COURT: So it was signed?

"[PLAINTIFF'S COUNSEL]: Yes. It was signed by Ms. Warneke on behalf of her sister. . . .

"THE COURT: And she was on the phone at the time?

"[PLAINTIFF'S COUNSEL]: She was. [¶] . . . [¶]

"THE COURT: Hold on for a second. [¶] Can she just sign it again?

"[PLAINTIFF'S COUNSEL]: Yes.

"THE COURT: Why don't' we do that?

"[PLAINTIFF'S COUNSEL]: Fine.

"THE COURT: That will ratify her signature that she had authority to sign."

14

Following the three-day trial, Bell filed a motion for new trial and argued, inter alia, that the court's order to have Raspin ratify the agreement constituted an irregularity in the proceedings, as the court provided guidance on how to "fix the problems created by . . . Raspin's failure to execute" the agreement. The court denied the motion, reasoning in part that Raspin had ratified the agreement in her verified petition to confirm before the court inquired of and ordered her written ratification.

### 2. *Analysis*

Bell contends that the trial court's order for counsel to obtain Raspin's ratification of the agreement deprived him of his due process right to an unbiased judge.

Plaintiffs contend, and we agree, that Bell has forfeited this argument for the failure to raise the issue in a timely manner. Civil litigants have a constitutional due process right to an unbiased judge. (*Tri Counties Bank v. Superior Court* (2008) 167 Cal.App.4th 1332, 1339.) "Nevertheless, a litigant should seek to resolve such issues by the required statutory means and 'his negligent failure to do so may constitute a forfeiture of his constitutional claim.' [Citation.] This is particularly true in civil cases where 'a constitutional question must be raised at the earliest opportunity or it will be considered to be waived.' [Citations.]" (*Ibid.*; accord, *Moulton Niguel Water Dist. v. Colombo* (2003) 111 Cal.App.4th 1210, 1218.) Well aware of the asserted ground for disqualifying the trial judge months before trial commenced (see §§ 170.1, subds. (a)(2)(A) & (a)(6)(A)(iii), 170.3, subd. (c)), Bell waited

15

several months (until after trial and an adverse judgment) to assert his claim of judicial bias. The failure to timely object renders Bell's claim on appeal forfeited.

In any event, viewed in context, the trial court's statements and order did not violate Bell's right to an unbiased judge. The standard of judicial bias is an objective one, focusing on "those circumstances where, even if actual bias is not demonstrated, the probability of bias on the part of a judge is so great as to become 'constitutionally intolerable.'" (*People v. Freeman* (2010) 47 Cal.4th 993, 1001.) Cases of judicial bias are "generally are confined to 'the exceptional case presenting extreme facts'" (*Today's Fresh Start, Inc. v. Los Angeles County Office of Education* (2013) 57 Cal.4th 197, 219) in which the judge's conduct "'was so prejudicial that it denied'" the complaining party a fair trial. (*People v. Snow* (2003) 30 Cal.4th 43, 78.)

The trial court's statement and order are not an exceptional case in which the trial judge's conduct colored the record with actual or reasonably perceptible bias. Bell was never denied a fair or adversarial proceeding. He remained free to, and did in fact, challenge the agreement's enforceability in light of the omitted signature. As we have discussed, Raspin had already manifested written assent to the terms of the agreement by giving Warneke authority to sign on her behalf, and by later filing a verified petition to confirm even before the court ordered her signed ratification. In short, the court's directive was simply a common sense and unremarkable method of resolving a potential issue. On pain of being accused of partiality, trial courts are not required to ignore practical and obvious procedural solutions.

16

D.    *Motion for Continuance*

    1.    *Relevant Proceedings*

Three court days before trial was set to commence, Bell filed an ex parte application to continue trial. In the application, Bell argued he had substituted in lead counsel, Walter Weiss, 85 days prior, and in the course of reviewing "certain documents within the files of predecessor counsel less than thirty days ago . . . Mr. Weiss discovered a set of notes" of alleged fraud on behalf of Barbara Taaff, Bell's counsel in the conservatorship proceeding. "Weiss and others aiding him in preparing for trial of this matter" discovered the notes "[a]pproximately three weeks ago." Bell argued that Taaff's notes, which were attached to the application, referenced legal advice she had given plaintiffs for proceeding against Bell, as well as counseling Bell to fund the TGB Trust with his "sole and separate property."[8] Bell asserted he needed more time to explore plaintiffs' role in "misleading [Bell]'s prior counsel into setting in motion the funding of the TGB Trust."

---

[8]    It is unclear who authored the handwritten notes, which are dated between May 2015 and February 2016. As best we can read them, the notes stated in part: "[Courtney] is waiting to speak to John re receipt for jewelry. . . . [¶] She & Kimberly don't have (or want to spend) the money on a conservatorship"; "Kimberly is afraid of what John might do to her if she were appointed [conservator] and making decisions about hiring family law attorney for mom. Advised them to get their own attorney to petition for appt of PPF. They don't want to spend the money; informed her they could be repaid from mom's estate if allowed by the court"; "Traded penthouse for larger unit on 10th floor. Is that allowed under terms of trust? [¶] Can he sell it?"

17

At a hearing on the ex parte application, Bell argued that plaintiffs had "engineered the conservatorship" by having the trust funded with Bell's separate property. Plaintiffs opposed the application, and argued the handwritten notes did not evidence wrongdoing or extrinsic fraud. Following argument of counsel, the court denied the ex parte application.

2.    *Analysis*

Trial dates are regarded as "firm." (Cal. Rules of Court, rule 3.1332(a).) Trial continuances "are disfavored," and may be granted "only on an affirmative showing of good cause requiring the continuance." (*Id.*, rule 3.1332(c); see *In re Marriage of Falcone & Fyke* (2008) 164 Cal.App.4th 814, 823.)

The denial of a request for a continuance of trial may not be reversed on appeal absent a clear showing of an abuse of discretion. (*Oliveros v. County of Los Angeles* (2004) 120 Cal.App.4th 1389, 1395; *Link v. Cater* (1998) 60 Cal.App.4th 1315, 1321.) The appellant bears the burden of demonstrating from the record that such an abuse occurred. (*Denham, supra*, 2 Cal.3d at p. 566.)

Bell has not shown that the trial court abused its discretion in denying his application for a continuance. The rules of court list seven different circumstances indicating "good cause." (See Cal. Rules of Court, rule 3.1332(c).) Only one circumstance was raised in Bell's application, namely "[a] party's excused inability to obtain essential testimony . . . or other material evidence." (*Ibid.*) But that exception

18

requires proof of diligent efforts.  (*Ibid.*; see *Kuhland v. Sedgwick* (1860) 17 Cal. 123, 128 ["absence of evidence is no cause for a continuance, unless reasonable diligence has been used to procure it"].)  Bell has never established when he or any of his counsel, current or former, procured Taaff's handwritten notes, or when those notes were initially reviewed.  Without any additional information provided by Bell, his then-recently retained counsel's discovery of the notes already in Bell's possession cannot be deemed reasonably diligent.

Moreover, Bell has not demonstrated how the court's denial of his ex parte application prejudiced him.  (*People v. Barnett* (1998) 17 Cal.4th 1044, 1125.)  Taaff's handwritten notes, made years before plaintiffs filed this action to remove Bell as successor trustee, do not establish or even imply extrinsic fraud or unclean hands.  (See 8 Witkin, Cal. Procedure (5th ed. 2020) Attack on Judgment in Trial Court, § 225, p. 832 [essential characteristic of extrinsic fraud is that it prevents a fair adversary hearing, keeps a party ignorant of the action, or fraudulently prevents another from presenting a claim or defense]; *Mattco Forge, Inc. v. Arthur Young & Co.* (1997) 52 Cal.App.4th 820, 846 [misconduct which brings clean hands doctrine into operation "'must relate directly to the transaction concerning which the complaint is made, i.e., it must pertain the very subject matter involved and affect the equitable relations between the litigants'"].)  As conceded by Bell in the conservatorship action, the premarital agreement provided that Grant-Bell's primary residence would be held of title by her individually.  The TGB Trust also provided that Grant-Bell's residence would be held in trust for Bell's use during his lifetime before passing to

the plaintiffs as the trust's beneficiaries. The court's substituted judgment conveying the Alta Loma residence, Grant-Bell's primary residence, to the TGB Trust simply conformed to the intent of the premarital agreement, and to the terms of the TGB trust.

## DISPOSITION

The judgment is affirmed. Respondents shall recover their costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.

We concur:


MANELLA, P. J.


CURREY, J.